# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
April 26, 2016 Session

## STATE OF TENNESSEE v. LAJAUN HARBISON

**Appeal from the Criminal Court for Knox County**
**No. 101406D     Steven W. Sword, Judge**

_____

**No. E2015-00700-CCA-R3-CD – Filed August 19, 2016**

_____

The Defendant, Lajuan Harbison, stands convicted by a Knox County jury of four counts of attempted voluntary manslaughter and four counts of employing a firearm during the commission of a dangerous felony, for which the trial court sentenced him to an effective term of twenty-two years' incarceration. On appeal, the Defendant argues (1) that the trial court erred by refusing to grant his motion for a severance; (2) that the evidence was insufficient to support his convictions, including therein a double jeopardy challenge to his employing a firearm during the commission of a dangerous felony convictions, and (3) that consecutive sentencing was improper. Following our review, we first conclude that a severance of defendants should have been granted and that the failure to do so constitutes reversible error. We also conclude that the evidence was insufficient to support one of the Defendant's convictions for attempted voluntary manslaughter because the doctrine of transferred intent is inapplicable to such a conviction, and therefore, the corresponding count of employing a firearm during the commission of said dangerous felony likewise cannot stand. Additionally, multiple convictions for employing a firearm during the commission of a dangerous felony violate double jeopardy principles because the statute does not authorize separate firearms convictions for each felony committed in a single transaction. Accordingly, we reverse the judgments of the trial court and remand the case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed; Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Gerald L. Gulley, Jr., (on appeal), and A. Philip Lomonaco (at trial), Knoxville, Tennessee, for the appellant, Lajuan Harbison.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Randall E. Nichols, District Attorney General; and TaKisha M. Fitzgerald and Philip H. Morton, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

This case concerns a September 7, 2012 shooting near Austin East High School ("Austin East") in Knoxville, Tennessee, involving multiple parties and victims. One person was injured but survived. The Defendant, along with Laquinton Brown, Carlos Campbell, and Arterious North, were charged by presentment for various offenses related to the shooting:

| Count | Defendant(s) | Offense | Victim |
|---|---|---|---|
| 1 | Laquinton Brown Carlos Campbell | Attempted Especially Aggravated Robbery (by violence) | L.P.[1] |
| 2 | Laquinton Brown Carlos Campbell | Attempted Especially Aggravated Robbery (by putting in fear) | L.P. |
| 3 | Laquinton Brown Carlos Campbell | Attempted Aggravated Robbery (by violence) | Q.T. |
| 4 | Laquinton Brown Carlos Campbell | Attempted Aggravated Robbery (by putting in fear) | Q.T. |
| 5 | Laquinton Brown Carlos Campbell | Attempted First Degree Murder | Lajuan Harbison |
| 6 | Laquinton Brown Carlos Campbell | Attempted First Degree Murder | Arterious North |
| 7 | Laquinton Brown Carlos Campbell | Attempted First Degree Murder | Montiere King |
| 8 | Laquinton Brown Carlos Campbell | Employing a firearm during the commission of a dangerous felony | |
| 9 | Laquinton Brown Carlos Campbell | Employing a firearm during the commission of a dangerous felony | |
| 10 | Laquinton Brown Carlos Campbell | Employing a firearm during the commission of a dangerous felony | |
| 11 | Arterious North Lajuan Harbison | Attempted First Degree Murder | L.P. |

---

[1] It is the policy of this court to protect the identity of minor victims and witnesses. Therefore, we will use initials for each minor involved in this case.

-2-

| 12 | Arterious North Lajuan Harbison | Attempted First Degree Murder | Laquinton Brown |
|----|--------------------------------|-------------------------------|-----------------|
| 13 | Arterious North Lajuan Harbison | Attempted First Degree Murder | Carlos Campbell |
| 14 | Arterious North Lajuan Harbison | Attempted First Degree Murder | M.W. |
| 15 | Arterious North Lajuan Harbison | Employing a firearm during the commission of a dangerous felony | |
| 16 | Arterious North Lajuan Harbison | Employing a firearm during the commission of a dangerous felony | |
| 17 | Arterious North Lajuan Harbison | Employing a firearm during the commission of a dangerous felony | |
| 18 | Arterious North Lajuan Harbison | Employing a firearm during the commission of a dangerous felony | |

The Defendant and his three co-defendants proceeded to a jury trial in late January 2014. The State dismissed counts seven and ten against co-defendants Campbell and Brown before trial began.

At the Defendant's trial, the State presented the following proof.[2] Linda Detienne, a bus operator for Knoxville Area Transit, testified that she was driving on Martin Luther King Jr. Avenue just past Austin East around 4:30 p.m. on September 7, 2012. According to Ms. Detienne, the bus was travelling slowly, going approximately twenty miles per hour in accordance with the school-zone speed limit, and there were a large number of children in the area because school had already been dismissed. Ms. Detienne stated that a gold car, which was two cars in front of her bus, came to an abrupt halt in her lane of traffic shortly before the end of the Austin East school zone; there was no discernible reason for the stop, according to Ms. Detienne. She testified that she had to stop the bus and that there was a cream-colored car between her bus and the stopped car. However, the others cars in front of the gold car continued on.

Ms. Detienne said that she saw a young, "light-colored-skin" black man with "[d]readlocks" exit from the passenger's side of the gold car and approach two boys on the sidewalk. The gold car's door remained open. The man, who was wearing khaki pants, a t-shirt, a hat, and sneakers, said something to the boys, and in response, the boys "pulled the inside of their pockets out" and demonstrated with their hands that they did not have anything. Ms. Detienne became concerned the boys were being robbed. She saw the same thing happen once more—the man said something to the boys, and they

---

[2] Because the Defendant was tried along with three co-defendants, we will limit our summary of the trial testimony to facts pertinent to the Defendant's convictions.

again turned out their pockets, which were empty, according to Ms. Detienne.  Ms. Detienne recalled that the young man then returned to the gold car, retrieved a gun, and fired the weapon.  Ms. Detienne said that she immediately called her central base to tell them that there had been a shooting and that she needed emergency responders.  Ms. Detienne instructed her passengers to get under their seats.

Ms. Detienne recalled that the young man initially aimed at and fired on the boys on the sidewalk but that he then fired more shots into the air.  According to Ms. Detienne, when the man fired the weapon, the boy on the right instantly went to the ground, but "[a] lot of shots" were fired after that point.  She described,

> [A]fter they showed him their pockets again, and he shot them, he went between the car that was in front of me and the car that he had got out of, shooting, and then he went to the sidewalk, and he was still shooting, and then he ran around [a nearby] brick house.

She further explained that the driver of the gold car drove away as soon as the shooting began.

Ms. Detienne's dispatch told her to protect the passengers on her bus by continuing on her route, so she could not render aid to the victim of the shooting and drove away from the scene as instructed.  Ms. Detienne testified that she did not observe another vehicle being involved or "hear shots coming from a different direction at any time" during the incident.

Malaika Rhonda Guthrie testified that she was a dance teacher at both Austin East and Vine Middle School ("Vine"), which were approximately one mile apart.  Around 4:30 p.m. on September 7, 2012, she was leaving Austin East in her silver Dodge Magnum returning to Vine.  Ms. Guthrie had her daughter and her daughter's friend in the car with her; they were both students at Vine; and Ms. Guthrie's daughter had left something at Vine.  Ms. Guthrie said that she had to stop on Martin Luther King Jr. Avenue because the gold car in front of her had "stopped in the middle of the street." She explained that there was no stop sign or any other reason for the car to have stopped.  The bus behind her also stopped, blocking her in.  Ms. Guthrie said that a man, who was wearing a white t-shirt and khaki-colored pants and had dreadlocks, got out of the car in front of her and that the car's door remained open.  According to Ms. Guthrie, the man approached two male students on the sidewalk.  Ms. Guthrie said that the students, whom she recognized, appeared to be walking home.  Ms. Guthrie became concerned that a skirmish was about to ensue because the man who exited the gold car was acting "aggressive[ly]."

According to Ms. Guthrie, the man confronted the students, exchanging words with them, which caused the boys to pull their pockets out and put their hands up, gesturing that they did not have anything on their person. Ms. Guthrie now believed that the students were being robbed. She testified that, when the man turned back towards the car, she heard "[s]everal" gun shots, which she described as "tow, tow, tow-tow-tow-tow-tow." Ms. Guthrie also said that she lowered her head and was trying to get the two girls' heads down inside the car when the gunfire began, so she was unable to see much of what transpired next. However, Ms. Guthrie was able to see that the man who confronted the boys on the sidewalk returned to and got inside the gold car before it drove away and that there was also a man running away from the scene. She confirmed that she did not see any guns during the incident, stating that the individual was not brandishing a weapon when he approached the students, and she was unable to identify anyone shooting.

Ms. Guthrie testified that, when the car in front of her drove away and the shots ceased, one of the students, Q.T., was screaming and the other, L.P., was lying on the ground. Ms. Guthrie pulled her car over so that she could assist the two students. She enlisted the aid of another man, and they went to help L.P. She instructed the girls to remain inside the car and called 9-1-1.

A.G., Ms. Guthrie's daughter, testified that she knew L.P., one of the boys on the sidewalk, because they were in the eighth grade together at Vine in September 2012. A.G. also gave her recollection of the events surrounding the shooting, confirming much of her mother's testimony. A.G. remembered a man getting out of the front passenger's seat of the car that had stopped in front of her mother's car. A.G. added that she believed that there were three people in the gold car from which this individual exited—a third man in the backseat on the driver's side. According to A.G., the man approached the students on the sidewalk, saying something to them, and they "emptied their pockets." She likewise believed that the boys were being robbed. She saw "the guy start going back to his car," when a dark car drove by in the other lane of traffic, travelling in the opposite direction. According to A.G., someone in the dark car started shooting first, and the "car in front" of her mother's car returned fire. Both cars drove away, and she no longer saw the individual who had approached the boys on the sidewalk. A.G. affirmed that, following the incident, she told police that the man who had exited the car in front of her pulled out a gun and fired back at the dark car. She was unsure "if he was standing or if he was back in the car when he started shooting."

S.W. testified that, on the day that her cousin, L.P., was shot, she recalled sitting outside "on the wall" near Austin East with a group of freshmen. L.P. was nearby on the sidewalk, accompanied by his friend Q.T. While sitting there on the wall, she saw a car go by three times, and there were four people inside that car who were listening and dancing to loud music, S.W. said. According to S.W., the second time that the car

-5-

passed, the occupants were "throwing Crip" gang hand signs, and both L.P. and Q.T. "were doing hand signals back." It initially appeared to S.W. that L.P. knew someone inside the car. However, on the third pass, the car stopped in front of her group, and one man exited and "stepped up" to Q.T. and L.P., "tr[ying] to rob" them. According to S.W., the man patted his pockets, asking the two boys if they had "something," and the boys responded by emptying their pockets and saying that they did not "have anything." The man then identified himself and his gang affiliation and just "stepped back and pulled a gun out and started shooting." After that, another passenger from behind the driver of the car exited and began shooting. S.W. recalled that the driver and the fourth passenger, whom she recognized as M.W. (the named victim in the fourteenth count of the indictment in this case), watched from inside the car.

Q.T. testified that, after school on the day that L.P. was shot, he and L.P. were sitting on a wall talking when he saw a gold car drive by twice. The second time, he made a hand signal toward the car because he believed his brother was in the back seat. The car returned for a third time about fifteen or twenty minutes later and stopped in the street. The front passenger exited and asked, "Which one of y'all threw a Blood?" and the two boys responded, "We don't bang." Q.T. noticed that the man had a gun protruding from the waistband of his pants. The man told him to empty his pockets, but as Q.T. was complying, "[t]he fellow that was in the other car started shooting." Q.T. opined that the gunshots came from somewhere "behind the guy that got out of the car." He and L.P. tried to run, but L.P. fell, saying that he had been shot. Q.T. recalled seeing the man who had approached them run across the street after the gunfire broke out, all the while retrieving the gun from his waistband and returning fire at the people shooting at him. The car the man got out of sped off, according to Q.T. Q.T. said that the guy who got out of the car and asked them to empty their pockets never fired in Q.T. or L.P.'s direction. He acknowledged that he was carrying a backpack on his back, which the man never inquired about.

L.P. testified that the day he was shot, he had not attended school because his mother had just come home from the hospital. After school was over, however, he planned on attending a sporting event, a football game, so he went to meet Q.T. L.P. said that he was standing near a wall on Martin Luther King Jr. Avenue when he saw a "[b]rownish-gold" car drive by two or three times and loud music was playing from inside. While standing there with Q.T., S.W., and some other girls, the car drove by again, but this time it stopped. According to L.P., someone exited from the passenger's side, and that person identified himself and began talking to Q.T. L.P. recalled that the passenger who approached Q.T. had a gun in his waistband. Furthermore, there were a total of four people in that car, L.P. said, and L.P. was able to identify M.W. as the individual in the rear passenger's seat.

-6-

According to L.P., the man approached Q.T. and asked, "Which one of y'all threw up that Blood?" and Q.T. said, "Didn't nobody throw up that Blood." The man then demanded that Q.T. empty his pockets, so Q.T. complied; however, L.P. agreed that the individual did not inquire about Q.T.'s backpack that was on his back. L.P. stated that he was not asked by this individual to empty his pockets and that he "was just standing there" when he saw a "blackish" car with tinted windows pull up and someone from inside started shooting. According to L.P., "[a] bullet hit the wall," and the two boys looked at each other and "tried to take off," but he fell to the ground. When the shooting began, the man from the gold car crossed the street and fired his weapon in the direction of the high school, L.P. said; L.P. stated that the man never got back inside the car. L.P. was shot in the arm and stomach, and because a bullet hit a nerve, he had to learn to walk again.

L.P. was shown a photographic array following the shooting. He was able to identify co-defendant Brown as the man who exited the car and approached him and Q.T. that day. L.P. testified that he did not know co-defendant Brown prior to September 7, 2012. However, L.P. stated that he did know the Defendant prior to that day, agreeing that they "were on friendly terms," and testified that he did not know of any "reason for [the Defendant] to try to kill [him]."

Testimony from multiple crime scene investigators and a firearms examiner came next. The investigation of the tan Chevrolet Malibu (which carried co-defendants Campbell and Brown, and M.W. during the shooting) showed that the car had been "hit at least four times" based upon the visible number of bullet holes. Three spent bullets were found inside—one under the driver's floor mat, one in the passenger's floorboard, and one in the left rear passenger's seat—and a bullet fragment was discovered in the passenger's side door. Based upon the trajectory of one of the bullet holes, a forensic witness opined that it would have been difficult for someone to shoot from another car that was positioned parallel to the Malibu and cause this damage, without that person's getting out or having the door open while leaning back. Upon examination of the dark-colored Chevrolet Cobalt (which carried the Defendant, co-defendant North, and Mr. King), ten "defects" were observed on the passenger's side of the car, two "defects" on the hood, and one "defect" on the driver's side; the "defects" were in the nature of both holes and dents, most of which appeared to have been caused by bullets. A spent bullet was located on the driver's side floorboard, and a 9mm shell casing was found behind the passenger's seat. Two wallets were also found inside the Cobalt: one belonging to the Defendant and one belonging to Mr. King. Although each vehicle had been hit multiple times by several bullets, it was unknown if all bullet contacts occurred during the September 7, 2012 shooting.

Additionally, two different caliber shell casings, .380 and .45, and several bullet fragments were found at the crime scene on Martin Luther King Jr. Avenue. It was determined that L.P. was shot by a .45-caliber bullet and that the bullet extracted from his body shared "class and some individual characteristics consistent with" a .45-caliber bullet taken from the Malibu. The class characteristics on these two bullets were consistent with having been fired through a Hi-Point handgun. However, the examiner could not say with one-hundred percent accuracy that the two bullets were fired from the same gun due to "a lack of sufficient matching individual characteristics." She also could not say if all bullets had been fired on the same occasion. She was able to conclude that a minimum of three guns were used at the shooting scene.

Lisa Knight, employed by the Tennessee Department of Safety and Homeland Security in the handgun office, testified that none of the defendants had applied for or received a handgun permit. She said it is against the law to carry a loaded handgun in public without a handgun carry permit.

Officer Brandon Wardlaw of the Knoxville Police Department ("KPD") testified that he assisted with interviewing Laquinton Brown on September 10, 2012. According to Ofc. Wardlaw, although co-defendant Brown was not initially forthcoming, he eventually claimed that L.P. and Q.T. made gang signs with their hands, so they stopped the car. Co-defendant Brown got out of the vehicle and approached L.P. and Q.T. and had them turn their pockets inside out in order to make sure they were not carrying any weapons. According to co-defendant Brown, the Cobalt arrived, shots were fired, and he "hit the deck." He stated that his friends in the Malibu left him there "to die." After the gunshots, he heard witnesses say that "somebody got it," but upon realizing that he was okay, he ran from the scene and stole a bicycle in order to return to his neighborhood. He explained that he was not from the east side of town, but rather, his "stomping grounds" were the west side of Knoxville. Co-defendant Brown maintained throughout the interview that he was not carrying a weapon on the day of the shooting and that he did not rob the two boys.

Investigator Chas Terry of the KPD testified that he assisted with Carlos Campbell's interview on October 21, 2012. According to Inv. Terry, co-defendant Campbell also did not regularly frequent East Knoxville. Co-defendant Campbell claimed that on September 7, 2012, he drove from "the Ville"[3] to a street near Austin East and stopped near a group of students. Co-defendant Campbell said that, once stopped, another car pulled up beside him, and shots were fired from that car. He immediately ducked, and he heard a "bunch" more gunshots. Co-defendant Campbell never said he had a gun or fired during the shooting.

---

[3] This is apparently a reference to a part of town known as "Mechanicsville."

-8-

Investigator Amy Jinks of the KPD testified that she interviewed co-defendant Brown on September 10, 2012, the Defendant on February 9, 2013, and co-defendant North on March 9, 2013. Based on the interviews, she concluded that co-defendant Campbell had been driving the Malibu, that co-defendant Brown had been sitting in the front passenger's seat, and that M.W. had been sitting behind co-defendant Campbell. She also concluded that the Defendant had been driving the Cobalt, that co-defendant North had been sitting in the front passenger's seat, and that "Little Paul" and Mr. King had been sitting in the back seat.

The Defendant was not initially truthful, according to Inv. Jinks; however, the Defendant later admitted to shooting in front of the school and told Inv. Jinks that he had gotten rid of his handgun. Co-defendant North also admitted to Inv. Jinks that he fired a gun that day. In his interview, co-defendant North said that he had a .357, that he thought the Defendant had a "little nine," and that "Monte" or Mr. King also had a 9mm. Co-defendant North also said that one person in the back seat of the Cobalt had a Glock and that the other had a Hi-Point. On October 7, 2012, Inv. Jinks showed photograph arrays to L.P., and he selected co-defendant Brown's and M.W.'s photographs.

On cross-examination, Inv. Jinks confirmed that co-defendant Brown never admitted to possessing a weapon on the day of the shooting. She also acknowledged that she never learned the identity of "Little Paul"; however, she did eventually find and interview Mr. King. Regardless, she had no other proof, except for co-defendant North's statement, that Mr. King or Little Paul were shooters, so they were not prosecuted.

At the conclusion of Inv. Jinks' testimony, the State rested its case-in-chief. Regarding co-defendants Brown and Campbell, the trial court ruled that the State had failed to present any evidence that they attempted to take property from Q.T. or L.P. and granted their motions for judgment of acquittal in counts one through four. However, the court stated that it was going to instruct the jury on the lesser-included offense of aggravated assault in counts two and four. The trial court denied all of the defendants' remaining motions for judgment of acquittal.

The twenty-year-old Defendant testified in his own behalf that he used to attend Austin East and would go to Vine to teach students how to the play the African drums. The Defendant admitted that he carried a 9mm handgun at the time of the shooting out of fear and for his own protection. The Defendant explained that his mother's house, his best friend's house, and his car had all been "shot up" in the two weeks preceding this shooting. He said that, on September 7, 2012, he was driving the Cobalt on Martin Luther King Jr. Avenue toward Austin East when he stopped because he saw an illuminated school bus stop sign. He said he saw "somebody robbing somebody" and recognized Q.T., as someone he used to teach to play drums at Vine, and L.P., because he

-9-

went to school with L.P.'s sister. The Defendant stated that the robber stepped back towards the Malibu, that the robber then fired a shot, and that he shot back because the "little kid looked like . . . he was in danger at that time[.]" He said that he was trying to "save the kid" and that he was not trying to kill anyone. He stated that the Malibu was only three feet away from him and that he could have killed the people in the Malibu if he had wanted to. As he drove away from the scene, shots were still being fired at the Cobalt.

On cross-examination, the Defendant testified that there had been prior incidents between him and co-defendants Brown and Campbell and that it was "possible" he did not like co-defendants Brown and Campbell. He acknowledged that a man named Cuben Lagrone was convicted of shooting his mother's house and noted that Mr. Lagrone associated with co-defendants Campbell and Brown. After the incident at his mother's house, he procured a weapon from someone on the "street."

According to the Defendant, co-defendant North was sitting in the front passenger's seat, Mr. King was sitting behind the Defendant, and Paul Issacs was sitting behind co-defendant North, on the day in question. The Defendant agreed that he "typically h[u]ng out in East Knoxville" and that he did not expect to see co-defendants Brown and Campbell in that area. The Defendant stated that he was stopped "side by side" with the Malibu, that he recognized co-defendant Brown as the man robbing the boys on sidewalk, and that he also recognized co-defendant Campbell as the driver of the Malibu. According to the Defendant, Q.T. and L.P. had their hands raised up, and as co-defendant Brown was "backing up" to the Malibu, the Defendant heard a gunshot. He said that he fired into the air in order to stop the robbery. He stated that he fired two shots and that co-defendant North, Mr. Isaacs, and Mr. King also fired their guns. Co-defendant Brown was shooting at them as they "pulled off," according to the Defendant.

The Defendant testified that his car had been "shot up" approximately two weeks before this incident during the shooting at his mother's house. The Defendant testified on recross examination that the hood of the Cobalt and the driver's side window were damaged on this prior occasion. He agreed that the remaining damage to the Cobalt came from the shootout in front of Austin East.

Co-defendant Brown testified that on September 7, 2012, he was in the Malibu with co-defendant Campbell but that he did not have a gun. Two other men, whom he knew at the time as "NY" and "D", were in the back seat. The four of them were riding around and "chilling, listening to loud music" when somebody on the sidewalk flagged them down by flashing a hand "signal for getting attention." The Malibu came to a stop; co-defendant Brown got out; and he approached one of the boys on the sidewalk "[t]o

address the situation." According to co-defendant Brown, "You got to know somebody to [flash a hand signal like] that. You don't just do that to anybody to strangers, period."

Co-defendant Brown walked up to one of the boys and asked for his name. The boy replied with a nickname. Co-defendant Brown identified himself, and the boy asked where he was from. Realizing that he did not know the boy, he went into "safety mode" and took "two or three steps back." He instructed the boys to raise their shirts up and empty their pockets to make sure they did not have any weapons, and the boy he was speaking directly with complied. However, the other boy did not do as told. As he was returning to the Malibu, he heard a gunshot and fell to the ground between the car and the curb. He heard additional gunshots, and the Malibu drove away, leaving him there. Co-defendant Brown said, although a bullet "grazed" him, he got up and "took off running." He found a bike and rode away.

He maintained that he did not shoot at the Cobalt. Defense counsel asked the co-defendant if he had ever owned or possessed a firearm prior to September 7, 2012, and he said no. Co-defendant Brown further averred that he had "no involvement" in ever shooting "anything" owned or driven by the Defendant.

On cross-examination, co-defendant Brown clarified that he meant that he did not possess a weapon on September 7, 2012, but agreed that he had possessed a weapon on a previous occasion, specifically April 15, 2012. At first, he denied carrying a weapon on August 13, 2012, while riding in a car with Mr. Lagrone, who was his "little cousin." He then stated that he could not recall any such car ride when the two of them were carrying weapons in their laps.

The State played a video for co-defendant Brown and asked if he could be seen or heard in the video. Co-defendant Brown said he did not see any faces or recognize any voices. Two weapons are displayed by the two individuals in the video.

Co-defendant Brown testified that he later learned that "NY" was M.W. He could not recall ever being videotaped by Mr. Lagrone while in the company of M.W. Co-defendant Brown agreed that he was not a friend of the Defendant's.

Upon further cross-examination by the prosecutor, co-defendant Brown again relayed his version of events. He testified that, on September 7, 2012, his uncle rented the Malibu for co-defendants Brown and Campbell, and they planned to drive the car to Gatlinburg to celebrate co-defendant Campbell's birthday. They picked up M.W. and "D"[4] and ended up traveling westbound on Martin Luther King Jr. Avenue when they

---

[4] This individual was identified as Devin Williams.

saw a "crowd of students."  Co-defendant Campbell was driving, co-defendant Brown was sitting in the front passenger's seat, and M.W. was sitting behind co-defendant Campbell.  Co-defendant Brown denied that he "threw up" a Crips gang sign at the students or that the students made gang signs at him.  He said that they were "flagging [him] down," so he got out of the car to see if he knew them.  He asked them a couple of questions and realized that he did not know the two young men.  He then went into "aware mode" and made sure the boys did not have anything they could use as weapons.  He turned to leave and heard one gunshot before he fell to the ground.  Multiple gunshots ensued, according to co-defendant Brown.  He said no one in the Malibu had a gun.

The State called Ofc. Wardlaw on rebuttal and played a video recorded on August 13, 2012.  Ofc. Wardlaw testified that he investigated the shooting of the Defendant's mother's house and that, during the course of that investigation, reviewed Mr. Lagrone's cellular telephone.  Ofc. Wardlaw said that Mr. Lagrone's phone showed frequent contact between him and co-defendants Campbell and Brown, including pictures and videos.  Ofc. Wardlaw identified the two individuals in the video played for the jury as co-defendant Brown and Mr. Lagrone.  In the video, Mr. Lagrone can be seen driving down Western Avenue, and as the car passes two or three police cars pulled onto the side of the road, Mr. Lagrone and co-defendant Brown pull out guns, saying, "There go the boys. Get ready."  Ofc. Wardlaw said that Mr. Lagrone had a Smith and Wesson handgun and that co-defendant Brown had "a firearm with an extended magazine."

After all parties rested their cases, the jury deliberated and found co-defendant Campbell guilty of two counts of aggravated assault and acquitted him of all remaining counts.  The jury found co-defendant Brown guilty of two counts of aggravated assault, two counts of attempted voluntary manslaughter as lesser-included offenses of attempted first degree premeditated murder, and two counts of employing a firearm during the commission of a dangerous felony.  The jury found the Defendant and co-defendant North guilty of four counts of attempted voluntary manslaughter as lesser-included offenses of attempted first degree premeditated murder and four counts of employing a firearm during the commission of a dangerous felony.

Subsequently, the trial court sentenced the Defendant to an effective twenty-two-year sentence for his convictions.  This timely appeal followed.

## ANALYSIS

On appeal, the Defendant contends that the trial court erred by refusing to sever the defendants; that the evidence is insufficient to support his convictions, including a double jeopardy challenge to his four employing a firearm during the commission of a

-12-

dangerous felony convictions; and that the trial court erred in imposing consecutive sentencing. We address each in turn.

*I. Motion to Sever*

The Defendant claims the trial court erred in denying his motion to sever his case from that of his co-defendants "on the basis of mutually antagonistic defenses, limited ability . . . to control his own defense, and an impaired ability of the jury to make individualized determinations of guilt." The Defendant argues that it was not possible for him to receive a fair trial "[i]n this atmosphere" because (1) he and his "hostile" co-defendants Campbell and Brown were charged in the same presentment "even though the proof at trial was that Campbell and Brown . . . . were in an automobile from which gunshots were fired at the car in which [the Defendant] was driving"; (2) "there is an inherent conflict between [himself] and his [hostile] co-defendants" who "inherently have a different and conflicting posture with respect to potential defenses, motives for cross-examination of State witnesses, and proof"; and (3) the jury heard "lurid testimony and [saw] videos about guns, unindicted bad actors, and other crimes that were unrelated to [the Defendant] but which involved Brown and/or Campbell[.]"

Essentially, he is claiming (1) that the defenses he and his hostile co-defendants relied upon, as rival gang members shooting at each other, were antagonistic; (2) that the testimony of the State's witnesses and evidence regarding the hostile co-defendants' out-of-court statements were also antagonistic and harmful, leading to a verdict based upon "guilt by association"; and (3) that he was forced to defend against both the State and the hostile co-defendants. In response, the State contends that the trial court did not abuse its discretion in refusing to sever the cases because "[p]roof of every co-defendant's role in the shooting was relevant to establish the motive and criminal responsibility of every other co-defendant" and because the Defendant "does not identify a single piece of evidence that would have been excluded in a separate trial." Additionally, the State submits that the Defendant has failed to prove "prejudice stemming from the admission of recorded statements by Brown and Campbell[.]"

**A. Procedural Background.** Prior to trial, on November 15, 2013, the Defendant filed a motion to sever his case from the cases of his three co-defendants pursuant to Tennessee Rule of Criminal Procedure 14(c). As grounds for severance, he advanced a theory of mutually antagonistic defenses among him and his co-defendants and contended that severance was necessary for a fair determination of his guilt. Specifically, the Defendant provided the following facts to support his claim of conflicting defenses:

> Co-defendant Campbell must prove that [the Defendant] is guilty to make his own defense. [Co-defendant] Campbell would defend their [sic]

-13-

charges by denying the fact that he robbed the victims and assert[ing] [the Defendant] had no legitimate ground to act in self-defense or protect the victims by shooting [the co-defendants] Campbell and [Brown]. However, [the Defendant] witnessed [the co-defendant] Campbell rob the victims. [The Defendant] had a legitimate ground to protect himself and the victims by shooting at [the hostile] co-defendants. The mutually antagonistic defenses will violate [the Defendant's] right to make a case for a lesser-included offense.

He continued that, if any of his co-defendants chose to testify on their own behalf at a joint trial, that testimony "might influence the jury unfavorably against the Defendant" and possibly "confuse the jury and make the jury unable to form a fair judgment for the Defendant." Finally, the Defendant stated that, at a joint trial, he would "be required to relinquish unfettered control over the defense of the charges" to "counsel representing the co-defendants[.]"

A brief hearing took place on the motion on December 12, 2013. At that time, none of his co-defendants joined in his motion, but they did not oppose it either. The Defendant's lawyer stated his intent to rely on his "brief" and not present additional argument. However, no brief appears in the technical record, only the motion itself. The State responded to the Defendant's severance request by addressing any potential problems with out-of-court statements by the co-defendants. According to the prosecutor's recount of the various pretrial statements, co-defendant Brown denied robbing the victims or firing any shots; co-defendant Campbell also denied exchanging fire and denied "knowing anything at all about a robbery"; the Defendant admitted to driving the car and "shooting back"; and co-defendant North admitted "to looking for" co-defendant Campbell and "shooting at them." The prosecutor stated that she intended to redact any reference to the co-defendants contained in the various individual statements and that she was merely seeking to introduce, through the use of these statements, "the fact that they put themselves there." She concluded, "[A]t least at this point in time[, f]rom the statements they gave, we don't think there's antagonistic defenses."

Co-defendant Campbell's attorney added that it was likely "self-defense claims" would be presented by both sides at trial. The prosecutor responded that such a defense was not a basis for severance and, moreover, that their pretrial statements did not support such a claim. The trial court stated that it would take the motion under advisement and issue a ruling "before the end of" the following week. The court's minutes on the day the motion was heard provide that the motion was denied. No further disposition on the Defendant's motion for severance is apparent from the appellate record.

-14-

Just prior to trial, on January 22, 2014, co-defendant Brown filed a motion to sever his case from that of his three co-defendants, arguing that Bruton v. United States, 391 U.S. 123 (1968), required severance because "the State will attempt to introduce statements by other [c]o-defendants without the co-defendants actually testifying in this cause[,]" thereby violating his right to confront the witnesses against him. At the hearing on the motion which followed on the eve of trial, co-defendant Brown's attorney noted that the court "ha[d] been down this road on this motion before" and denied the motion. His attorney further explained, "[I]t may actually simply be a standing objection to any statements that will deny [co-defendant] Brown the right to confront and cross-examine any witnesses against him." He concluded by stating that the prosecutor had "taken some steps to overcome a Bruton issue," which was "reflected in the [c]ourt's order on the prior severance" motion, but that "there may be an issue on confrontation" still. The State responded that the various statements had been redacted to exclude any reference to any co-defendants contained therein and, therefore, that no confrontation problem existed. However, redacted copies of the co-defendant's statements had not been provided to the defendants at that point in time. The trial court averred that the problem with this issue was that the precise details of admission were unknown until the statements were introduced at trial. The trial court then stated,

> I would take the General at her word that she's removed any references to those, whether that be [to] have the officer not make any mention of it, or play the video that's been properly redacted, which I assume is probably what we're going to [have] happen.
>
> So what I'll do . . . is allow you to renew your motion to sever at the appropriate time and raise any objections to confrontation that you feel like should be raised.

On the morning of trial, all four of the defendants were brought into the courtroom for pretrial motions. Before proceedings began, a bench conference was held. Co-defendant Brown's attorney noted that there were "some family members" present in the courtroom and expressed his concern for his safety and his client's "in this kind of dynamic[.]" He also discussed the potential seating arrangement, stating that he did not "want to sit between these two guys[.]" The trial court first offered to bring more officers into the courtroom but then decided not to because "it's a big red sign" to the jury and it was "too late . . . to put [the officers] in plain clothes." The Defendant's lawyer then suggested that the trial court "could just talk to everybody about being nice." It was noted that the two unfriendly groups of defendants were separated by a "bend . . . in the table" and that a "Ms. Martin," who was "young" and "[could] take them," would be

-15-

placed between the two factions. The trial court thereafter admonished the defendants to "remain calm" throughout the trial and allow their attorneys to work on their behalf.[5]

As a pretrial issue, the Defendant's attorney again asked that the Defendant's case be severed from his three co-defendants because a joint trial would "be a mess" due to the fact that two of the co-defendants were adverse to the other two co-defendants: "Our defense is going to be that we knew they were hostile. We took actions to protect ourselves and others[.]" His lawyer said that the hostile co-defendants had shot at the Defendant's mother's house and also that one of these same co-defendants had been convicted of attempted first degree murder for shooting into the Defendant's friend's house[6] just two to three weeks prior to the shooting in this case. The Defendant's attorney said that, as a defense, he wanted to present evidence of these past occurrences to show what the Defendant's "mindset was about these [hostile co-defendants]"—that the Defendant "knew how dangerous they were" and was fearful of them—and that he acted in defense of a third person, whom he believed was being robbed, "when he saw these people on the side of the street[.]" His counsel asserted that presentation of these facts was necessary for the Defendant to receive a fair trial and that any redaction of this information from the various statements of the co-defendants would diminish his defense. According to the Defendant's counsel:

> I don't think we can try this case if they're going to try to keep excluding these things out of the interviews, [be]cause [Inv.] Jinks says many times in her interviews about shooting cars and shooting at houses and so on, and if that's going to be redacted—then none of—or the evidence that's critical to our defense, is being redacted out of this trial.

The trial court inquired of co-defendant Brown's lawyer if he had filed a motion to exclude prior bad acts on behalf of his client and, if so, which bad acts specifically. Co-defendant Brown's attorney said that co-defendant Campbell had filed such a motion, not his client, but he reiterated his "concern regarding a joint trial where [his] client [was] both a defendant and a victim." However, co-defendant Brown's lawyer then spoke of possible prior bad acts that might be used at trial, noting "some altercation at some gas station 30 minutes prior to this" and that "[t]here w[ere] also some references that [Q.T.], one of the alleged victims of the alleged robbery, was beefing with either [the Defendant] or [co-defendant] North." Co-defendant Brown's counsel summarized, "So you got all

---

[5] There was apparently "some altercation out in the hallway" during the trial, but the jurors were not aware that anything took place, according to the trial court.

[6] This is a reference to co-defendant Campbell's actions and convictions for shooting at Devante Nail's residence. See State v. Carlos Campbell, No. E2014-00697-CCA-R3-CD, 2015 WL 6155893 (Tenn. Crim. App. Oct. 20, 2015), perm. app. denied (Tenn. Apr. 6, 2016) (designated not for citation).

these prior bad acts that we're accused of being involved in, but also all prior bad acts of some of these other people who are accused of being involved in, and it's our request that all those prior bad acts be excluded." Co-defendant Brown's attorney noted that the State had not provided any Tennessee Rule of Evidence 404(b) notice of its intention to use prior bad act evidence against any of the defendants, but before any such evidence was offered at trial, he was preliminarily requesting a hearing on its admissibility.

Counsel for co-defendant Campbell explained that he did not file a motion in limine to exclude prior bad act evidence or evidence of prior convictions "because that's the rules of evidence" and he "didn't think [he] needed to." Co-defendant Campbell's attorney stated that the Defendant's lawyer "raise[d] a good point" though because it was his client's position that Campbell's co-defendants could not introduce evidence of Campbell's convictions unless Campbell testified. According to co-defendant Campbell's attorney: "If the [S]tate can't do it, neither can a co-defendant. Secondly, mentioning [Campbell's] statement without [Campbell's] taking the stand, that's hearsay. So what [the Defendant] is saying his defense is, it—you know, the rules of evidence wouldn't allow it, and we object strongly." He agreed that excluding such evidence of co-defendant Campbell's prior bad acts would deprive the Defendant of his defense.

Turning to the fourth co-defendant, co-defendant North's lawyer stated his agreement with the Defendant's lawyer's request for a severance, positing that this situation, where all four defendants were both defendants and victims depending on the specific count of the indictment being examined, was confusing to present at a single trial. Co-defendant North's attorney opined,

> It's going to appear to the jury it's the [S]tate against all four of us, which it is. Yet it's these two against these two.
>
> They're the victims. They're the defendants.
>
> They're the victims. They're the defendants.
>
> All four are the defendants against the two minors. . . .
>
> . . . [I]t's going to be extremely confusing where they're robbing [Q.T. and L.P.]. We're charged with the attempted murder of [L.P.], and it's—it's an appearance of us working together, where we're not. We're forced here together.

-17-

Co-defendant North's counsel did not want to appear as if he was working with co-defendants Campbell and Brown because co-defendant North was attempting to blame the cause of the shooting on those two hostile co-defendants.

The Defendant's attorney thereafter raised one more point to support his argument for severance:

> Just redacting the witnesses' statements doesn't do it. [Inv. Jinks] investigated all of this. She investigated these drive-by shootings. She knows about the robbery 30 minutes ahead of time. She says it on the videos. We'd have to redact. I would be barred from asking her questions about investigation of a co-defendant if we'd have to . . . stay together on this thing.

The Defendant's counsel opined that Inv. Jinks "had the best information" about these prior bad acts committed by the other two hostile co-defendants and that, to effectively present a defense, the Defendant "ha[d] to be able to demonstrate to the jury what he kn[ew] when this took place." Co-defendant North's attorney noted his concern that they still had not been provided with the redacted statements that the State intended to present at trial and that it was likely he may ask inappropriate questions about the contents of the statements based upon his trial preparation.

The State replied that co-defendant Brown denied the "previous aggravated robbery" that Inv. Jinks asked him about during questioning and, therefore, any testimony by her on the subject amounted to inadmissible hearsay. Furthermore, the prosecutor clarified that Inv. Jinks was stating that co-defendant Brown "was beefing with [co-defendant] North and [the Defendant]," not that Q.T. "was beefing" with any of the defendants, so her investigation on this topic was also inadmissible hearsay. The State continued,

> [I]f the defense wants to introduce some prior bad acts that one of these defendants did, . . . they're going to have to put on direct evidence. So I guess the defendant would—if they're going to assert self-defense, I would think that the defendant would have to take the witness stand to explain to the jury why they were in fear of this person.
>
> . . . I think to allow them to introduce their statements that they made to the investigators, that's going to be hearsay.

In conclusion, the prosecutor requested that the severance be denied.

-18-

The trial court asked the Defendant's lawyer how he intended to introduce evidence of these prior bad acts. He replied that he intended to ask Inv. Jinks on cross-examination about her investigation of the co-defendants. The trial court stated that this line of questioning of Inv. Jinks was inadmissible hearsay but that the Defendant could possibly present witnesses "who said . . . they were robbed by them" and so forth. The Defendant's lawyer stated he was asking for a severance "so [the defense] could . . . bring these other witnesses in." The trial court noted that it was the morning of trial and asked which witnesses the Defendant's attorney intended to call that would be prevented from testifying if the defendants were jointly tried. The Defendant's attorney indicated that "there are witnesses out there" and that one was present in the courtroom—the Defendant's mother, whose house was shot at by the other two hostile co-defendants. Co-defendant Brown's lawyer noted his objection to testimony of this type "[u]nder prior bad acts" and the Confrontation Clause and asserted "this is kind of part and parcel of the severance issue." Co-defendant Brown's attorney further asserted that the interviews of the Defendant and co-defendants North and Campbell were hearsay and "a confrontation issue as well."

The trial court told the Defendant's attorney to call the Defendant's mother as a witness. The Defendant's attorney indicated that the Defendant's mother was scared and did not want to testify, stating, "That's part of the problem we're having right here." The Defendant's lawyer further noted that he had not prepared her to testify. The trial court then indicated that it had heard this motion once before and that there was no proof presented at the separate hearing on that previous motion that the two groups of co-defendants had antagonistic defenses—"other than saying that these two guys were mad at our two guys." The trial court said, however, that if there had been "proof at that time that would have been admissible and relevant toward a self-defense argument, that certainly might have been relevant" to the issue of severance.

After conferring with the Defendant, the Defendant's attorney informed the trial court that he was not going to call the Defendant's mother to testify and that there was no other evidence he intended to present at that time. Co-defendant Campbell's counsel reiterated his concern that the State not be allowed to mention any of Campbell's convictions and averred that the "same rule applies to other people in the courtroom." The prosecutor noted that there was no evidence in the record connecting Devante Nail to the Defendant and clarified that the person convicted of shooting at the Defendant's mother's house was Mr. Lagrone, who was not a co-defendant in these proceedings.[7] The trial court ruled that neither the State nor any of the defendants' counsel could discuss

---

[7] While this is true, it over simplifies the matter. As noted in the factual background of the opinion, a cell phone video recording was played at trial showing co-defendant Brown riding in a car with Mr. Lagrone, and both men were displaying weapons and speaking in an aggressive manner. It was also testified to at trial that Mr. Lagrone associated with co-defendants Campbell and Brown.

any prior bad acts of the four men "other than this alleged shooting" at trial without first requesting a hearing outside the presence of the jury on the prior bad act.

The parties then discussed the bullet holes in the Cobalt. Co-defendant Brown's lawyer argued that testimony about previous bullet holes in the car could lead to evidence of prior bad acts and was going to be "very confusing" for the jury. Brown's attorney explained that co-defendant North had given a statement to Inv. Jinks that the Cobalt had "been shot up many times before on different occasions," thereby creating some question whether the bullets holes came from the September 7, 2012 shooting or some previous shooting. Brown's counsel then asked that the trial court exclude any "photographs or evidence that would relate to holes being in" the Cobalt because there was "no correlation between those bullet holes on the right—passenger side and [co]defendant Brown['s] shooting" at the Cobalt on September 7. However, the trial court found the evidence of bullet hole damage to the Cobalt to be "highly relevant" and not "unfairly prejudicial" because the vehicle was involved in the alleged shooting. Brown's attorney reiterated his concern that such testimony and evidence might "be subject to a prior bad acts deal altogether as well under 404(b)." Co-defendant North's attorney noted a possible <u>Bruton</u> issue, "[A]gain, we run into a problem of they're unable to cross-examine [co-defendant] North regarding this. So you have [co-defendant] North or whoever giving a statement to the investigator [about the condition of the car] that the investigator's going to relate into trial that none of the others can cross-examine on," and "it's going to be very confusing for the jury[.]"

Co-defendant Brown's lawyer then requested that any "gang reference[s]" be excluded from trial. The prosecutor stated that, in order to tell the complete story, she needed to be able to present testimony about the two boys' allegedly throwing gang signs to show why co-defendants Brown and Campbell stopped the car and co-defendant Brown approached the boys and identified himself as a member of a particular gang. However, the prosecutor said she did not intend to introduce evidence that the men were in rival gangs. The trial court ruled that there was to be no reference at trial of this being "a gang shooting"—of members of one gang shooting at members of another gang.

After a recess, the trial court found on the severance issue as follows:

[S]ince there hasn't been any evidence really presented . . . up to this point that the [c]ourt can rely on in saying that it'd be admissible and would mandate a severance for a fair determination, the [c]ourt's going to deny the motion now. However, it's possible during trial that things can develop in such a way in order to promote a fair determination and for the trier of fact

-20-

to be able to distinguish the evidence and apply the law intelligently, we may have to sever it, but we're going to see how it goes.

At trial, the defendants were provided a copy of the redacted statements that the State intended to use as evidence, and the following discussion ensued at a jury-out hearing. Co-defendant Brown's attorney asked if a limiting instruction was going to be issued on how the jury was to consider the various statements—an instruction that was referenced by the State during a prior severance motion hearing.[8] Additionally, the Defendant's lawyer objected to the redacted version of the Defendant's statement, asking for the entire version to be played. The trial court determined that the statements as redacted did not raise any <u>Bruton</u> issues, and the State would, therefore, be allowed to play the portions presented. The trial court stated its intent "to continue to deny the severance at this time," reasoning,

> I've never seen that whole statement. You know, in these severance motions that we've had, nobody's gotten up here and testified and said, this is why I want to testify to this, or this is the evidence that should come in my case, but not the others. That is what makes a severance a severance is when testimony is admissible in one case, but not the others, and so, you know, he can't bring in his own statement.

The Defendant's lawyer agreed that he could not play the entire recording at the Defendant's trial if he were tried alone.[9] His attorney continued, "But my objection is that if . . . they were to play [it], then there would be facts that would demonstrate a severance." The trial court noted that the State did not intend to introduce anything other than the redacted versions at that time, and trial continued.

After the State rested its case-in-chief, the parties discussed the jury instructions. The State asked for the "natural and probable consequences" instruction based upon the actions of co-defendant Campbell's letting co-defendant Brown out of the car and "for what Brown does when he gets out of the car," asserting,

> [I]f [co-defendant] Campbell knew that by stopping and letting [co-defendant] Brown out to engage these two guys on there, that [co-defendant] Campbell, if he's criminally responsible for that offense [aggravated assault], would be also criminally responsible for any other

---

[8] The State agreed to a limiting <u>Bruton</u> instruction, but it appears that the trial court did not think it was necessary based on its decision that no violation of <u>Bruton</u> occurred. Such an instruction was never issued to the jury.

[9] However, without the entire recording, we are unable to assess the accuracy of this concession.

offense that occurred as a . . . natural and probable consequence of the original offense [i.e., attempted first degree murder].

Co-defendant North's attorney noted in response, "And this also is where the severance problem comes in where this is going to—you're not going to be able to delineate and say that just applies to them and doesn't apply to us." Co-defendant Brown's counsel also requested that the instruction not apply to co-defendant Brown. However, the court ruled that it was "an accurate statement of the law[,]" that it did not "apply to one person or the other" but to "everybody in this jurisdiction," and that the parties were free to construct their arguments as they saw fit concerning the instruction. The parties also debated over whether Tennessee Code Annotated section 39-11-407[10] should be charged, with both the Defendant's lawyer and co-defendant Campbell's attorney lodging objections, noting "all the different issues like severance, and things like that." However, the trial court chose to charge it anyway based upon the involvement of Mr. Issacs and Mr. King.

At the end of direct examination of co-defendant Brown, co-defendant Campbell's attorney asked if it was "too late to move for a severance" because he was "very concerned" about the prior bad act testimony from Brown which possibly implicated co-defendant Campbell. The prosecutor stated she did not intend on asking co-defendant Brown about the prior shooting on cross-examination. Co-defendant Campbell's counsel reiterated his apprehension before cross-examination that co-defendant Brown could not "open the door" to prior bad acts by co-defendant Campbell. The trial court stated that it would have to see how the questioning of co-defendant Brown developed during cross-examination before making any ruling. No further objection was lodged during co-defendant Brown's testimony.

**B. Principles of Law.** The practice of trying co-defendants in a single trial is "aimed at achieving improved judicial economy and efficiency." Tenn. R. Crim. P. 8, Advisory Comm'n Cmts. As relevant in this case, Tennessee Rule of Criminal Procedure 8(c)(3)(b) permits joinder of defendants when conspiracy is not an alleged offense but when the offenses charged are "so closely connected in time, place, and occasion that it would be difficult to separate proof of one charge from proof of the others." Once properly joined, Rule 14 of the Tennessee Rules of Criminal Procedure establishes the

---

[10] This section provides, in pertinent part, as follows:

> In a prosecution in which a person's criminal responsibility is based upon the conduct of another, the person may be convicted on proof of commission of the offense and that the person was a party to or facilitated its commission, and it is no defense that . . . [t]he person for whose conduct the defendant is criminally responsible has been acquitted, has not been prosecuted or convicted, has been convicted of a different offense or different type or class of offense, or is immune from prosecution.

guidelines for severance of defendants. Rule 14(c)(1) states, "If the defendant moves for a severance because an out-of-court statement of a co-defendant makes reference to the defendant but is not admissible against the defendant, the court shall determine whether the State intends to offer the statement into evidence at trial." Rule 14(c)(2)(i) states that the trial court shall sever co-defendants' cases before trial if "it is deemed necessary to protect a defendant's right to a speedy trial or it is deemed appropriate to promote a fair determination of the guilt or innocence of one or more defendants." Similarly, Rule 14(c)(2)(ii) provides that a court shall grant severance of co-defendants' cases during trial if "it is deemed necessary to achieve a fair determination of the guilt or innocence of one or more defendants."

A defendant usually requests a severance in two types of cases: (1) the existence of antagonistic defenses, see, e. g., Morrow v. State, 82 Tenn. 475 (1884); Roach v. State, 45 Tenn. 39 (1867), or (2) where one of the defendants has made a confession or admission that implicates another co-defendant that the State seeks to introduce at trial, see, e. g., Rounds v. State, 106 S.W.2d 212 (Tenn. 1937); Strady v. State, 45 Tenn. 300 (1868); Hester v. State, 450 S.W.2d 609 (Tenn. Crim. App. 1969). Dorsey v. State, 568 S.W.2d 639, 642 (Tenn. 1978). The law on a motion for severance includes that "[t]he grant or denial of a motion for severance of defendants is a matter that rests within the sound discretion of the trial court, and [the reviewing court] will not disturb the trial court's ruling absent clear abuse of that discretion." State v. Dotson, 254 S.W.3d 378, 390 (Tenn. 2008) (citing Hunter v. State, 440 S.W.2d 1, 6 (Tenn. 1969); State v. Burton, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988)). "The test is whether or not the defendant was clearly prejudiced in his defense by being jointly tried with his codefendant." State v. Howell, 34 S.W.3d 484, 491 (Tenn. Crim. App. 2000) (citing State v. Wiseman, 643 S.W.2d 354 (Tenn. Crim. App. 1982)); see also Dotson, 254 S.W.3d at 390 (quoting Hunter, 440 S.W.2d at 6). "The record must demonstrate that 'the defendant was clearly prejudiced to the point that the trial court's discretion ended and the granting of [a] severance became a judicial duty' before an accused is entitled to a reversal of his conviction." Burton, 751 S.W.2d at 447 (quoting Hunter, 440 S.W.2d at 6); see also State v. Price, 46 S.W.3d 785, 803 (Tenn. Crim. App. 2000).

Regarding antagonistic defenses, this court has stated that the mere fact that there may be more damaging proof against one defendant as opposed to the other, does not require a severance. State v. Meeks, 867 S.W.2d 361, 369 (Tenn. Crim. App. 1993); see also State v. Howell, 34 S.W.3d 484, 491 (Tenn. Crim. App. 2000) ("Disparity in the evidence against the defendants is not alone sufficient to warrant the grant of a severance.") (citation omitted). Stated another way, "the speculative risk of a spill-over effect" does not justify a conclusion that a joint trial was an abuse of discretion. Meeks, 867 S.W.2d at 369. Furthermore, "[w]hile 'mutually antagonistic' defenses may mandate severance in some circumstances, they are not prejudicial per se." State v. Ensley, 956

S.W.2d 502, 509 (Tenn. Crim. App. 1996) (quoting State v. Russell David Farmer, et al., No. 03C01-9206-CR-00196, 1993 WL 247907, at *4 (Tenn. Crim. App. July 8, 1993)) (internal quotation marks omitted); see also Zafiro v. United States, 506 U.S. 534, 537-38 (1993). Due to the difficulty in establishing prejudice, relatively few convictions have been reversed for failure to sever on these grounds. Ensley, 956 S.W.2d at 509 (citing Farmer, 1993 WL 247907, at *4). The test is whether "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro, 506 U.S. at 539. "Mere hostility between defendants, attempts to cast the blame for the offense on each other, or other fingerpointing and tattling will not, standing alone, justify the granting of a severance on the ground the defendants' respective defenses are antagonistic." Farmer, 1993 WL 247907, at *4 (quoting United States v. Arruda, 715 F.2d 671, 679 (1st Cir. 1983)) (internal quotation marks omitted). "The defendant must go further and establish that a joint trial will result in 'compelling prejudice,' against which the trial court cannot protect, so that a fair trial cannot be had." Ensley, 956 S.W.2d at 509 (quoting Farmer, 1993 WL 247907, at *4) (internal quotation marks omitted); see also United States v. Horton, 705 F.2d 1414, 1417 (5th Cir. 1983).

Turning to the second type of case, in Bruton v. United States, the United States Supreme Court held that admission of a statement of a non-testifying co-defendant which incriminates the complaining defendant violates the complaining defendant's constitutional right of cross-examination guaranteed by the Confrontation Clause of the Sixth Amendment. 391 U.S. 123, 126 (1968); see U.S. Const. amend. VI; Tenn. Const. art. 1, § 9; State v. Elliot, 524 S.W.2d 473, 477 (Tenn. 1975); Smart v. State, 544 S.W.2d 109, 111-12 (Tenn. Crim. App. 1976). The Tennessee Supreme Court has clarified, "[T]he rule in Bruton does not apply to confessions which [d]o not implicate the non-confessing defendant, nor does it apply to confessions from which 'all references to the moving defendant have been effectively deleted, provided that, as deleted, the confession will not prejudice the moving defendant.'" Id. (quoting ABA Standards Relating to Joinder and Severance § 2.3(a)(ii) (1967)). The use of a redacted statement is acceptable, provided the redaction does not alter the substance of the statement or remove information that is substantially exculpatory. Denton v. State, 945 S.W.2d 793, 801-02 (Tenn. Crim. App. 1996); see also Tenn. R. Crim. P. 14(c)(1)(B). "To hold otherwise would be to render impossible the use of a redacted statement in joint trials involving a Bruton situation." Denton, 945 S.W.2d at 801 (citation omitted). However, we note that the provisions of Rule 14(c)(1)(B) can be at odds with the completeness rule, which provides that, if the State introduces into evidence only a portion of the defendant's confession at trial, the defendant "is normally entitled to prove the whole of what was said in order for the jury to be able to weigh the whole statement" unless the confession "involv[es] a non-testifying co-defendant." Id. (citing Curry v. State, 397 S.W.2d 179,

-24-

182 (Tenn. 1965); State v. Brett Patterson, No. 88-245-III, 1989 WL 147404, at *6 (Tenn. Crim. App. Dec. 8, 1989)).

**C. Application of Facts and Law.** As noted above, relatively few convictions have been reversed for failure to sever on grounds of mutually antagonistic defenses due to the difficulty in establishing prejudice. See Ensley, 956 S.W.2d at 509. However, this is not say that it is impossible for a severance to be granted when the defendants raise mutually antagonistic defenses or a bright-line rule would be created. Under Rule 14(c)(2), the relevant inquiry for when a trial court shall grant a severance based upon a claim of mutually antagonistic defenses is whether a separate trial is appropriate (pretrial) or necessary (during trial) to advance "a fair determination of the guilt or innocence of one or more defendants." See Tenn. R. Crim. P. 14(c)(2).

We are unable to find any jurisprudence in this State delineating the "fair determination" language of Rule 14(c)(2), but we presume it to be a reference to the oft-cited concept of fundamental fairness. Our supreme court recently discussed what is meant by the phrase "fairness safeguards" in the context of the post-conviction statute of limitations.[11] See Bush v. State, 428 S.W.3d 1, 18 (Tenn. 2014). The Bush court determined that "fairness safeguards" in that context referred "to criminal procedural rules designed to guard against defendants being denied their due process right to a fundamentally fair adjudication of guilt." Id. (emphasis added). "Due process itself 'embodies the concepts of fundamental fairness,' justice, and 'the community's sense of fair play and decency.'" Id. (quoting Whitehead v. State, 402 S.W.3d 615, 623 (Tenn. 2013)). Moreover, "[d]ue process is flexible and calls for such procedural protections as the particular situation demands[,]" and "[t]he flexible nature of procedural due process requires an imprecise definition because due process embodies the concept of fundamental fairness." Whitehead, 402 S.W.3d at 623 (quoting Seals v. State, 23 S.W.3d 272, 277 (Tenn. 2000)) (internal quotations marks omitted and emphasis added). We conclude that the same rationale holds true for the "fair determination" language of Rule 14(c)(2).

In Zafiro, the United States Supreme Court, interpreting the Federal Rules of Criminal Procedure, held,

> We believe that, when defendants properly have been joined under
> Rule 8(b), a district court should grant a severance under Rule 14 only if

---

[11] Tennessee Code Annotated section 40-30-122 states that a new rule of constitutional criminal law can be applied retroactively, despite the one-year deadline for filing for post-conviction relief, if "the new rule places primary, private individual conduct beyond the power of the criminal law-making authority to proscribe" or if the new rule "requires the observance of fairness safeguards that are implicit in the concept of ordered liberty." See also Tenn. Code Ann. § 40-30-102(b)(1).

there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.

506 U.S. at 539. We find guidance in federal cases interpreting the "reliable judgment" exception espoused in Zafiro.

Interpreting Zafiro, the Eleventh Circuit addressed a defendant's claim of mutually antagonistic defenses, initially noting that mutually antagonistic defenses are not prejudicial per se. See State v. Blankenship. 382 F.3d 1110, 1122 (11th Cir. 2004). The circuit court then discussed when such a claim may garner relief, making the following observations:

[I]t seems that courts have applied this [reliable judgment] exception in primarily three situations. While this list appears to be fairly comprehensive, it is quite possible that other factors could also prevent a jury from "making a reliable judgment."

First, severance is mandated where compelling evidence that is not admissible against one or more of the co-defendants is to be introduced against another co-defendant. This is a concern, for example, "where the . . . gruesome evidence against one defendant overwhelms the de minimus evidence against the co-defendant(s)," United States v. Gray, 173 F. Supp.2d 1 (D.D.C. 2001); see, e.g., United States v. Sampol, 636 F.2d 621 (D.C. Cir. 1980) (mandating severance where limiting instructions "could not provide their intended protection against prejudice in the face of this emotional evidence").

In general, the strong presumption is that jurors are able to compartmentalize evidence by respecting limiting instructions specifying the defendants against whom the evidence may be considered. . . . [Nonetheless, s]everance must be granted where evidence is admissible against only one defendant only where that evidence is so convincing that not even limiting instructions are likely to prevent the jury from considering the evidence against all co-defendants. "The presumption that a jury will adhere to a limiting instruction evaporates where there is an overwhelming probability that the jury will be unable to follow the court's instructions and the evidence is devastating to the defense." United States v. Jones, 16 F.3d 487, 493 (2d Cir. 1994); see also United States v. Baker, 98 F.3d 330 (8th Cir. 1996) (reversing conviction for failure to sever where "very prejudicial and highly inflammatory" evidence admissible against

only one co-defendant was introduced because "the risk of substantial prejudice from the spillover effect . . . was too high to be cured by less drastic measures"); United States v. Briscoe, 896 F.2d 1476, 1498 (7th Cir. 1990) ("Generally, a cautionary instruction will be sufficient to cure any unfair prejudice. . . . [H]owever, if the evidence creates an unacceptably high inference of wrongdoing against another defendant, the district court should either exclude the evidence or sever the trials."). In such cases, the better course of action is to have separate trials in order to confine such powerful evidence to the defendants against whom it may properly be used.

The "reliable judgment" exception also applies in an extremely narrow range of cases in which the sheer number of defendants and charges with different standards of proof and culpability, along with the massive volume of evidence, makes it nearly impossible for a jury to juggle everything properly and assess the guilt or innocence of each defendant independently. See United States v. Cassano, 132 F.3d 646, 651 (11th Cir. 1998) ("A defendant satisfies the compelling prejudice requirement by showing that the jury was unable to sift through the evidence and make an individualized determination as to each defendant." (quotation marks and citation omitted)). This aspect of the "reliable judgment" exception is epitomized by United States v. Gallo, in which the district court observed,

> This case is far too extensive and intricate to expect that a jury would be able to discern the myriad of subtle distinctions and mental gyrations that would be required by the inevitable plethora of limiting instructions necessary. And even where jurors would at first attempt to heed the judge's admonitions, they could hardly be expected to retain such precise discriminations weeks and months down the line, when they retire to deliberate on the basis of a warehouse of diverse evidence.

668 F. Supp. 736, 753 (E.D.N.Y. 1987); see also Sampol, 636 F.2d at 647 (reversing conviction due to failure to grant a severance where "[t]here was never the clear distinction between the different defendants and the evidence against each of them that is called for by the Constitution's guarantee of a fair trial"); cf. United States v. Lotsch, 102 F.2d 35, 36 (2d Cir.1939) (Hand, J.) (holding that severance was not required if "there was no reasonable ground for thinking that the jury could not keep separate what was relevant to each [defendant]").

Finally, severance is required under Zafiro where one defendant is being charged with a crime that, while somehow related to the other defendants or their overall criminal scheme, is significantly different from those of the other defendants.

Blankenship. 382 F.3d at 1123-25. To some extent, all three situations are present here.

While the trial court, in limine, stated that this was not to become a "gang shooting" case, after reading the transcript, we believe that this is very likely what happened. There was considerable testimony that these four defendants were in rival gangs—the testimony about gang signs being thrown; co-defendant Brown's identifying his gang affiliation when he approached Q.T. and L.P.; testimony regarding what parts of town these men did and did not frequent; testimony that a few of the bullet holes in the Cobalt came from a prior incident; and prior bad act evidence involving the same groups of men. A substantial possibility existed that the jury unjustifiably inferred that this conflict alone demonstrated that both groups of men were guilty.

Co-defendant Brown's counsel even requested for the courtroom furniture to be moved around because he did not want to sit between the two groups. An altercation of some kind occurred in the hallway during trial, although the trial judge was adamant that the jury did not see anything. Additionally, there was some indication that the Defendant's mother may have testified in a separate trial, but she was too scared to do so in the courtroom with all four men present. The joint trial of all four co-defendants clearly created a hostile atmosphere.

Additionally, the State did introduce all four of the defendants' statements at trial, although they were redacted to remove any references therein to other co-defendants. However, the Defendant frequently stated his desire to have his whole statement entered into evidence, asserting that the entire interview was exculpatory in nature. The rule of completeness could have possibly come into play here, but as the trial court noted, an unredacted recording was never provided and does not appear in the record on appeal. However, we can safely conclude that statements redacted from the Defendant's interview were harmful to his hostile co-defendants.

Regardless, two of the four defendants chose to testify on their own behalf at trial—one from each faction. Co-defendant Brown's testimony led to the introduction of a highly inflammatory video, showing Brown and his cohorts as weapon-toting mischief-makers. The video, coupled with the Defendant's testimony about people shooting at his mother's house and a friend's house, allowed a highly prejudicial inference—that these four men were in constant combat with one another and were haphazardly wielding firearms around town. The trial court did give a limiting instruction concerning the

-28-

video—that the video was "intended only for the purpose of you judging the credibility of Mr. Brown's testimony concerning whether or not he had a weapon before." Regardless, the video created an unacceptably high inference of wrongdoing, and the evidence was only admissible against co-defendant Brown. Given this, there was a risk of substantial prejudice from the spillover effect.

Most importantly, all four men are both defendants and victims depending upon which count of the indictment is being addressed. This method of charging, where all four defendants are both defendants and victims at some point, inherently creates some inference of bad act evidence, and it is a practice wrought with the potential for constitutional error. Notably, all four men are never charged in a single count together. The Defendant's claim of self-defense or defense of others was undermined remarkably by the trial court's granting a judgment of acquittal on all robbery counts pertaining to the hostile co-defendants Campbell and Brown. The jury was left with the Defendant's argument that he was defending the boys on the sidewalk from a robbery, but the trial court told the jury as a matter of law that no robbery took place. The co-defendants' attorneys took aggressive, adversarial stances against one another, in effect becoming second, third, and fourth prosecutors, and eliciting "damaging evidence" not by the State, but by the co-defendants. The jury's hearing both defenses made neither defense believable.

Moreover, the parties debated over which instructions should be submitted to the jury. Although the natural and probable consequences instruction came into play based upon co-defendant Campbell's level of culpability, the instruction was not limited in any way and both counsel for North and Brown objected. Also, counsel for both the Defendant and co-defendant Brown argued that an instruction on Tennessee Code Annotated section 39-11-407 would be confusing to the jury given the issues and number of parties involved, but the trial court chose to give it anyway based upon the presence of Mr. Issacs and Mr. King. The trial court did appropriately charge the jury that they were to give separate consideration to each defendant; however, we believe the prejudice to the defendants and the mental gymnastics required by the jury were simply too great to be overcome by this instruction. We conclude that this case, "in which the sheer number of defendants and charges with different standards of proof and culpability, along with the massive volume of evidence," made "it nearly impossible for a jury to juggle everything properly and assess the guilt or innocence of each defendant independently." Blakenship, 382 F.3d at 1124-25.

All of these factors coupled together require us to conclude the Defendant was "clearly prejudiced" by the antagonistic nature of the defenses presented at the joint trial. A severance was appropriate to promote a fair determination of the guilt or innocence of the Defendant as mandated by Tennessee Rule of Criminal Procedure 14(c)(2). That is

not to say that we think all four men needed to be tried separately, but at a minimum, the hostile groups should have been divided. Accordingly, we hold that the trial court committed reversible error by failing to sever the Defendant's case either before or during the trial. Despite our conclusion that this case must be reversed and remanded for a new trial, we will address the remainder of the Defendant's arguments so as not to pretermit his remaining issues. See State v. Parris, 236 S.W.3d 173, 189 (Tenn. Crim. App. 2007) (following a similar procedure).

## II. Sufficiency of the Evidence

The Defendant argues that there was insufficient evidence to support all of his attempted voluntary manslaughter and employing a firearm during the commission of a dangerous felony convictions. An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

**A. Attempted Voluntary Manslaughter.** The Defendant challenges the sufficiency of the evidence supporting his four convictions for attempted voluntary manslaughter (named victims in counts 11, 12, 13, 14, respectively—L.P., co-defendant

Brown, co-defendant Campbell, and M.W.). First, he argues that the doctrine of transferred intent cannot support his conviction for the attempted voluntary manslaughter of L.P. Next, he contends "that there was insufficient proof to convict him of more than two counts of attempted voluntary manslaughter, based on lack of proof that he shot his handgun more than twice."

Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). A person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result. Tenn. Code Ann. § 39-11-302(a). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. Tenn. Code Ann. § 39-11-302(b). Voluntary manslaughter is a result-of-conduct offense. State v. Page, 81 S.W.3d 781, 788 (Tenn. Crim. App. 2002). Furthermore, the jury is responsible for reviewing the evidence to determine whether it supports a finding of adequate provocation. State v. Williams, 38 S.W.3d 532, 539 (Tenn. 2001).

Relevant to this case, a person commits criminal attempt when the person, acting with the kind of culpability otherwise required for the offense, "[a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" Tenn. Code Ann. § 39-12-101(a)(2). If an offense is defined in terms of causing a certain result, an individual commits an attempt at the point when the individual has done everything believed necessary to accomplish the intended criminal result. Tenn. Code Ann. § 39-12-101, Sentencing Comm'n Cmts.

The State also pursued several of the Defendant's convictions by employing a theory of criminal responsibility. "A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Further, a person is criminally responsible for an offense committed by the conduct of another, if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2). While not a separate crime, criminal responsibility is a theory by which the State may alternatively establish guilt based on the conduct of another. Dorantes, 331 S.W.3d at 386 (citing State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999)). No specific act or deed needs to be demonstrated by the State, and furthermore, the presence and companionship of an accused with the offender before and after the offense are

-31-

circumstances from which participation in the crime may be inferred. State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). However, to be convicted, "the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." Dorantes, 331 S.W.3d at 386 (citing State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994); State v. Foster, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)).

The Defendant first admits to carrying a 9mm handgun on September 7, 2012, and to firing that weapon in front of Austin East that day. He then claims, however, that the evidence is insufficient to support his conviction in count 11 (victim L.P.) because the bullet retrieved from L.P. was .45-caliber and, therefore, could not have been fired from his weapon. Regarding the remaining counts, 12, 13, and 14, the Defendant submits that "only two bullets/bullet fragments/shell casings from a 9[mm] gun that might have been aimed at persons were recovered from the scene or the automobiles involved in the shooting incident"; therefore, he cannot be "guilty of more than two attempted voluntary manslaughter counts." The State avers that the Defendant is "criminally responsible for every other firearm employed, every bullet fired, and every killing attempted by his three armed cohorts."

The Defendant was convicted of four counts of attempted voluntary manslaughter for crimes against L.P.—the unintended victim on the sidewalk—and co-defendant Brown, co-defendant Campbell, and M.W—occupants of the other vehicle involved in the shooting. Viewed in the light most favorable to the State, the proof shows that co-defendant Campbell was driving a tan-colored Chevy Malibu on September 7, 2012, and co-defendant Brown and M.W. were passengers in the vehicle. They drove past a group of students in front of Austin East, which included L.P. and Q.T., multiple times playing loud music and dancing. Testimony established that co-defendants Brown and Campbell did not normally frequent this part of Knoxville, and they had a history of violence with the Defendant and co-defendant North. The Defendant testified that the hostile co-defendants were involved in a shooting at his mother's house and at a friend's house in the weeks just prior to this incident.

As the car came past the students again, Q.T. flashed a hand signal at the men in the Malibu, believing that his brother was inside. Thereafter, co-defendant Campbell stopped the car in the lane of traffic, blocking another vehicle and a city bus. Co-defendant Brown got out and approached L.P. and Q.T. on the sidewalk, identifying himself and his gang affiliation and asking which one them threw "a Blood" gang sign. Co-defendant Brown, realizing that he did not know the boys, ordered them to pull out their pockets, claiming that he was checking the boys for weapons. Q.T. followed co-defendant Brown's directions to turn out his pockets. Both of the students saw that co-

defendant Brown was armed with a handgun in the waistband of his pants. Moreover, it appeared to multiple onlookers, at this point, that the boys were being robbed.

About the same time that Q.T. was turning out his pockets, the Defendant arrived in front of Austin East, driving a dark-colored Chevy Cobalt, with co-defendant North, Mr. King, and Mr. Issacs as passengers. The occupants of the Cobalt, believing the boys were being robbed, began firing at co-defendant Brown. Co-defendant Brown and one of the occupants of the Malibu returned fire, striking the Cobalt multiple times. Moreover, co-defendant Brown, who had been abandoned by his cohorts in the Malibu, continued to shoot at the Cobalt as it drove away.

Both the Defendant and co-defendant North admitted to firing a pistol during the altercation, a 9mm and .357 respectively. Co-defendant North stated that one of the men in the backseat of the Cobalt was a carrying a "Hi-point" pistol and discharged it that day. As a result of the shooting, L.P. was shot in the arm and the stomach. Police examined the Malibu that co-defendant Campbell was driving and found four bullet holes to the outside of the vehicle and two spent bullets inside the vehicle. The firearms examiner concluded that three guns, at a minimum, were used in the shootout that day.

*(1) Count 11 – Victim L.P.* The Defendant submits that the doctrine of transferred intent "cannot be applied to attempted voluntary manslaughter" and, therefore, his conviction in count 11 must be reversed and dismissed. The Defendant notes his own testimony that he had no intent to harm L.P. and L.P.'s testimony that he knew the Defendant, that they were on friendly terms, and that the Defendant had "[n]o reason . . . to try and kill" him. The State responds that "it is irrelevant [whether L.P.] was an intended victim specifically[,]" citing State v. Samuel Glass, No. E2012-01699-CCA-R3-CD, 2013 WL 4677654, at *11-12 (Tenn. Crim. App. Aug. 28, 2013), because the Defendant "and his cohorts intended to accomplish a killing," firing multiple shots in L.P.'s direction.

The common law doctrine of transferred intent, which provides that "a defendant who intends to kill a specific victim but instead strikes and kills a bystander is deemed guilty of the offense that would have been committed had the defendant killed the intended victim," has a checkered history in this state. Millen v. State, 988 S.W.2d 164, 166-67 (Tenn. 1999) (citations omitted) (recounting history of application of transferred intent doctrine). In Millen, our supreme court concluded that "the transferred intent rule has little application under our modern statutory law." 988 S.W.2d at 167. The court observed that "[a] plain reading" of the first degree murder statute[12] "indicates that a

---

[12] Millen arose under the first degree murder statute which required a killing be intentional, premeditated, and deliberate to constitute the offense. 988 S.W.2d at 165, n.2; see Tenn. Code Ann. § 39-13-202(a)(1) (1991) (amended 1995).

defendant's conscious objective need not be to kill a specific victim. Rather, the statute simply requires proof that the defendant's conscious objective was to kill a person, i.e., 'cause the result.'" Id. at 168. The court held that so long as "the evidence demonstrates that the defendant intended to 'cause the result,' the death of a person, and that he did so with premeditation and deliberation, then the killing of another, even if not the intended victim (i.e., intended result), is first degree murder." Id. However, the court noted that the "unintended victim" cases are more appropriately prosecuted as felony murder. Id. at 167-68.

Similarly, the mens rea of "knowingly" required for second degree murder can also focus on the result. Tennessee Code Annotated section 39-11-302(b) specifically states that a person acts "knowingly" when he is aware that his conduct is reasonably certain to cause the result. To this end, the Millen court also noted that previous cases have upheld the doctrine's application in second degree murder cases. 988 S.W.2d at 166; see State v. Harper, 334 S.W.2d 933 (1960); State v. Summerall, 926 S.W.2d 272, 275 (Tenn. Crim. App. 1995). Additionally, this court has expanded the ruling in Millen to convictions for attempted first degree murder, see, e.g., State v. Fabian Claxton, No. W2009-01679-CCA-R3-CD, 2011 WL 807459, at *6-7 (Tenn. Crim. App. Mar. 7, 2011), and attempted second degree murder, see, e.g., Glass, 2013 WL 4677654, at *11-12; State v. Tarrence Parham, No. W2009-00709-CCA-R3-CD, 2010 WL 2898785, at *11 (Tenn. Crim. App. July 26, 2010); State v. Horace Demon Pulliam, No. M2001-00417-CCA-R3-CD, 2002 WL 122928, at *5 (Tenn. Crim. App. Jan. 23, 2002), concluding that the reasoning in Millen was equally applicable to those offenses.

However, we agree with the Defendant that these cases deal only with first and second degree murders and any attempts to commit those crimes. Millen has not been expanded beyond that in this State. To the contrary, it has long been held under Tennessee law, and at common law, that a murder will only be reduced to voluntary manslaughter when the provocation was caused by the victim. See State v. Tilson, 503 S.W.2d 921 (Tenn. 1974); State v. Chris Jones, No. W2009-01698-CCA-R3-CD, 2011 WL 856375, at *11 (Tenn. Crim. App. Mar. 9, 2011); State v. Antonius Harris, No. W2001-02617-CCA-R3-CD, 2002 WL 31654814 (Tenn. Crim. App. Nov. 7, 2002); State v. Khristian Love Spann, No. 1230, 1989 WL 86566, at *7 (Tenn. Crim. App. Aug. 3, 1989); see also Commonwealth v. LeClair, 840 N.E.2d 510 (Mass. 2006) (providing a history of the rule at common law and citing supporting cases from other jurisdictions); 40 C.J.S. Homicide § 114 (2010); 40 Am.Jur.2d Homicide § 53 (2010).

The Tennessee Supreme Court first addressed this issue in Tilson, 503 S.W.2d at 921. The defendant in Tilson had been involved in a barroom brawl with several men prior to leaving the bar. Id. at 922. The defendant returned a short time later with a pistol and shot the victim who had taken no active part in the fight but had been "on the side" of

the one provoking the fight. Id. at 923-24. Our supreme court held that the defendant's actions did not constitute voluntary manslaughter because he killed an unarmed man who was simply "on the side" of the person who provoked an earlier fight with the defendant. Id. Similarly, in a more recent decision, this court held that there was insufficient evidence to support a defendant's claim of adequate provocation when the defendant had kidnapped several people and was shot by one of the victims before he "shot his unarmed victim whom he had been holding at gunpoint and who had done nothing to provoke the defendant." Harris, 2002 WL 31654814, at *12-13.

In the present matter, the jury found that the Defendant was adequately provoked by his hostile co-defendants, who had a history of violence towards one another. However, there was no evidence that L.P. provoked the Defendant, in fact, all evidence pointed to the contrary.[13] The Defendant testified that he was trying to protect L.P. from being robbed and had no intent to harm L.P. L.P. said that he was familiar with the Defendant, agreed that they "were on friendly terms," and testified that he did not know of any "reason for [the Defendant] to try to kill [him]." Voluntary manslaughter requires that the act of the slayer be the result of provocation instigated by the person slain. Accordingly, there is insufficient evidence to support the element of adequate provocation.

In addition to the transferred intent doctrine, the Defendant also challenges his criminal responsibility for Count 11 by arguing that the bullet recovered from L.P.'s body was determined to be .45-caliber and, therefore, was not fired by him.[14] However, given the lack of provocation on the part of L.P. towards any of the defendants, the State cannot base this conviction for the attempted manslaughter conviction of L.P. on the other's actions under a theory of criminal responsibility.

The evidence supported an inference that the .45-caliber bullet that hit L.P. came from inside the Cobalt the Defendant was driving. Co-defendant North testified that someone in the backseat was carrying a Hi-Point handgun. The firearms examiner said that the class characteristics on the bullet retrieved from L.P. and on the one found inside the Malibu were consistent with having been fired through a Hi-Point firearm.

---

[13] We note that this is further evidence of why a severance of defendants should have been granted in this case. Attempted voluntary manslaughter should not have been charged as a lesser-included offense of count 11. Again, this is a case "in which the sheer number of defendants and charges with different standards of proof and culpability, along with the massive volume of evidence," made "it nearly impossible for a jury to juggle everything properly and assess the guilt or innocence of each defendant independently." Blakenship, 382 F.3d at 1124-25. The nuances of these complex legal issues could have been minimized if a severance had been granted.

[14] Again, in the event of further appellate review, we will address all of the Defendant's arguments, so that they not be pretermitted.

Nonetheless, there is no evidence that L.P. provoked anyone—neither any of the occupants of the Cobalt nor the Malibu. Again, "[a] person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a) (emphasis added). Here, none of the shooters involved can be guilty of the offense of attempted voluntary manslaughter of L.P., which requires the act of the slayer be the result of provocation instigated by the person slain. There is no credible evidence to suggest that anyone was adequately provoked by L.P. that day. Therefore, there is no offense committed by the conduct of another for which the Defendant can be found guilty. The Defendant's conviction in count 11 must be reversed the evidence being insufficient to sustain it.

*(2) Counts 12, 13, and 14 – Victims Co-defendant Brown, Co-defendant Campbell, and M.W.* With regard to these three counts, we conclude that the evidence sufficiently establishes that the Defendant was acting in a state of passion produced by adequate provocation at the time he engaged in a shootout with these men in front of Austin East. The jury found that the Defendant was adequately provoked by his hostile co-defendants based upon their shared history of violence and his belief that the boys were being robbed. The Defendant and his other passengers exchanged fire with co-defendant Brown on the street and with the men still inside the Malibu. In so doing, while acting in a state of passion, they attempted to kill co-defendant Brown and the Malibu's occupants. Moreover, given this evidence, a rational juror could conclude that the Defendant was criminally responsible for his partners in crime, i.e., the others who were shooting from inside the Cobalt he was driving—co-defendant North, Mr. King, and Mr. Issacs. It is irrelevant whether the evidence showed that two 9mm bullets were fired or forty. The Defendant is criminally responsible for his own conduct and for the conduct of the others inside his vehicle. Accordingly, the evidence is sufficient to support the Defendant's separate convictions for attempted voluntary manslaughter in counts 12, 13, and 14.

**B. Employing a Firearm during a Dangerous Felony.** The Defendant contends that he cannot be guilty of four counts of employing a firearm during the commission of a dangerous felony. First, he submits that there was insufficient proof to support four separate counts because he employed only one weapon during the "shooting event" and because the proof showed that there were "at most . . . two shots by" the Defendant. Alternatively, he argues that he cannot be convicted of more than one count as a matter of law "because there was no proof that he used more than one firearm" during the shooting and the proper "unit of prosecution" should be the number of firearms employed. The State responds that the evidence is sufficient under a theory of criminal responsibility to support the Defendant's four convictions for employing a firearm during the commission of a dangerous felony. The State does not address the Defendant's unit of prosecution argument.

In Tennessee, it is a crime to employ a firearm during the commission of or attempt to commit a dangerous felony. Tenn. Code Ann. § 39-17-1324(b)(1), (2). Attempted voluntary manslaughter is defined as a dangerous felony. Tenn. Code Ann. § 39-17-1324(i)(1)(C), (M). We agree with the State that a conviction for employing a firearm during the commission of a dangerous felony can also be upheld based upon a theory of criminal responsibility. State v. Cortney R. Logan, No. M2014-01687-CCA-R3-CD, 2015 WL 5883187, at *14 (Tenn. Crim. App. Oct. 8, 2016) ("[A] rational jury could have found that [the defendant] was criminally responsible for [his co-defendant's] employment of the revolver during the flight or escape from the attempted first degree murder offense."), perm. app. denied (Tenn. Feb. 18, 2016); State v. Ricco R. Williams, No. W2011-02365-CCA-R3-CD, 2013 WL 167285, at *8 (Tenn. Crim. App. Jan. 14, 2013) ("[T]he State showed that the defendant . . . employed a firearm during the home invasion robbery at the . . . residence by virtue of his being criminally responsible for his compatriots' brandishing firearms[.]"), aff'd on other grounds, 468 S.W.3d 510 (Tenn. 2015). Moreover, as discussed in the section above, the evidence sufficiently supports the Defendant's convictions for attempted voluntary manslaughter under a theory of criminal responsibility. However, this acknowledgement ignores the crux of the Defendant's argument, which is essentially a challenge to his four convictions for employing a firearm during the commission of a dangerous felony on double jeopardy grounds, regardless of whether they are supported under a theory of criminal responsibility or as a principal.[15]

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides that "[n]o person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Courts have interpreted the Double Jeopardy Clause as providing three distinct protections: "(1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense." State v. Watkins, 362 S.W.3d 530, 541 (Tenn. 2012) (citations omitted). The Defendant's case falls within the third category. In these cases, the double jeopardy prohibition against multiple punishments functions to prevent prosecutors from exceeding the legislatively authorized punishment. Id. at 542. Whether multiple convictions violate the protection against double jeopardy is a mixed question of law and fact, which this court will review de novo without any presumption of correctness. State v. Smith, 436 S.W.3d 751, 766 (Tenn. 2014) (citing State v. Thompson, 285 S.W.3d 840, 846 (Tenn. 2009)).

---

[15] It is a dereliction of duty by the State not to address all of the arguments validly raised by the Defendant on appeal. It is precisely this issue that the State failed to address that necessitates reversal of three of the Defendant's employing a firearm during the commission of a dangerous felony convictions.

The Defendant argues that he received multiple punishments for the same offense in a single prosecution. The Tennessee Supreme Court has divided such claims into two categories: (1) unit-of-prosecution claims—"when a defendant who has been convicted of multiple violations of the same statute asserts that the multiple convictions are for the same offense"; and (2) multiple description claims—"when a defendant who has been convicted of multiple criminal offenses under different statutes alleges that the statutes punish the same offense." Smith, 436 S.W.3d at 766 (citing Watkins, 362 S.W.3d at 543-44) (emphasis in original). In this case, the Defendant was convicted under a single statute, Tennessee Code Annotated section 39-17-1324, for employing a firearm during the commission of or attempt to commit a dangerous felony. Therefore, his challenge is a unit-of-prosecution claim.

In Watkins, our supreme court stated as follows:

> When addressing unit-of-prosecution claims, courts must determine "what the legislature intended to be a single unit of conduct for purposes of a single conviction and punishment." Courts apply the "rule of lenity" when resolving unit-of-prosecution claims, meaning that any ambiguity in defining the unit of conduct for prosecution is resolved against the conclusion that the legislature intended to authorize multiple units of prosecution.

362 S.W.3d at 543-44 (citations omitted). "The legislature has the power to create multiple 'units of prosecution' within a single statutory offense, but it must do so clearly and without ambiguity." State v. Lewis, 958 S.W.2d 736, 739 (Tenn. 1997). A court determines legislative intent by examining "the language of the statute, its subject matter, the object and reach of the statute, the wrong or evil which it seeks to remedy or prevent, and the purpose sought to be accomplished in its enactment." Id. (quoting Mascari v. Raines, 415 S.W.2d 874, 876 (Tenn. 1967)). "As for criminal offenses in Tennessee, statutes are to be construed 'according to the fair import of their terms, including reference to judicial decisions and common law interpretations, to promote justice, and effect the objectives of the criminal code.'" Id. (quoting Tenn. Code Ann. § 39-11-104).

Tennessee Code Annotated section 39-17-1324 proscribes the following conduct:

> (a) It is an offense to possess a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony.
> (b) It is an offense to employ a firearm during the:
> (1) Commission of a dangerous felony;
> (2) Attempt to commit a dangerous felony;

(3) Flight or escape from the commission of a dangerous felony; or

(4) Flight or escape from the attempt to commit a dangerous felony.

The statute provides a list of eleven qualifying predicate felonies and requires that the underlying felony "be pled in a separate count of the indictment or presentment and tried before the same jury at the same time as the dangerous felony." Tenn. Code Ann. § 39-17-1324(d).

The legislature created criminal accountability for possessing with the intent to go armed or employing a firearm during the commission of or attempt to commit a dangerous felony. Regarding an employment offense, the legislature went one step further and criminalized the employment of a firearm during the flight or escape from the commission of or attempt to commit a dangerous felony. The focus of this section is on the possession or employment of the firearm, and its clear purpose is to enlarge, through the means of an additional conviction, the penalties for employing or possessing a firearm during the commission of or attempt to commit a predicate dangerous felony. This purpose is accomplished by construing the statute as requiring only one conviction without regard to whether the offender commits, in one transaction, one or more dangerous felonies. There is no language in subsections (a) or (b) indicating that the legislature intended to create more than one unit of prosecution for the prohibited conduct.

Additionally, subsection (c) of this statute addresses the possible encroachment of double jeopardy regarding multiple description claims by providing, in pertinent part, as follows:

(c) A person may not be charged with a violation of subsection (a) or (b) if possessing or employing a firearm is an essential element of the underlying dangerous felony as charged. In cases where possession or employing a firearm are elements of the charged offense, the [S]tate may elect to prosecute under a lesser offense wherein possession or employing a firearm is not an element of the offense.

This court has held that "the legislature's use of 'as charged' and 'charged offense' in Tennessee Code Annotated section 39-17-1324(c) convinces us that the legislature was authorizing, even encouraging, the State strategically to indict a defendant for both felonies." State v. Jeremiah Dawson, No. W2010-02621-CCA-R3-CD, 2012 WL 1572214, at *7 (Tenn. Crim. App. May 2, 2012) (holding that because carjacking was listed "as a dangerous felony for which a defendant could be prosecuted for employing a firearm," then "the legislature obviously intended for dual convictions and multiple punishment"). Thus, the legislative intent to permit dual convictions in that regard is

clear. The same is not true regarding the double jeopardy analysis at issue here—unit of prosecution claims. There is no clear intent that this employing or possessing statute be construed as allowing separate firearm convictions for each felony committed in a single transaction.

Moreover, a sentence imposed under this section "shall be served consecutive to any other sentence the person is serving at the time of the offense or is sentenced to serve for conviction of the underlying dangerous felony." Tenn. Code Ann. § 39-17-1324(e). There are a number of statutes in this state proscribing carrying or possessing dangerous weapons. It is apparent that the legislature concluded that these provisions were not adequate, and that a mandatory minimum consecutive three-year sentence shall in all cases be imposed, through the means of an additional conviction, on a person employing or possessing a firearm during the commission of a dangerous felony. See Tenn. Code Ann. § 39-17-1324(g)(1) (imposing a mandatory minimum three-year sentence to the Department of Correction). The mandatory consecutive sentence is imposed for possessing or employing under the circumstance that the felony is committed, not for the felony.

Even assuming some ambiguity, application of the rule of lenity, see Watkins, 362 S.W.3d at 543-44 (citations omitted), dictates that there is only one unit of prosecution for possession with intent to go armed or employing a firearm during the commission or attempt to commit a dangerous felony where multiple felonies are committed as part of a single transaction. The double jeopardy prohibition against multiple punishments functions to prevent prosecutors from exceeding the legislatively authorized punishment. This case is a prime example of just that.

We find support for this conclusion in this court's opinion in State v. Richardson, 875 S.W.3d 671 (Tenn. Crim. App. 1994). In Richardson, the defendant was at a Memphis bar with a companion during the early morning hours; that companion's ex-husband was also present. There was testimony that animosity existed between the defendant and the ex-husband. As the ex-husband tried to leave, the defendant fired his gun in the direction of the ex-husband but struck another bar patron. The defendant then approached the ex-husband and fired a second shot at his head at point-blank range. A jury convicted the defendant of aggravated assault of the bar patron, attempted first-degree murder of the ex-husband, and two counts of possession of a deadly weapon with the intent to employ in the commission of an offense. Richardson, 875 S.W.3d at 673-74.

On appeal, Richardson challenged his two separate convictions for possession of a deadly weapon with the intent to employ in the commission of an offense, see Tennessee

-40-

Code Annotated section 39-17-1307(c)(1),[16] as violative of double jeopardy principles. Richardson, 875 S.W.3d at 675. He argued that these convictions were the result of a single transaction of events which could only give rise to prosecution for one violation of section 39-17-1307(c)(1). Id. This court agreed, reasoning, "[T]he prohibited act is the possession of a weapon in the commission of an offense. It is a crime of intent. And, while there were two separate assaults, the defendant's single offending act was to possess the handgun under the applicable statutory language." Id. at 676. We believe the same rationale to be applicable to convictions under section 39-17-1324, the single offending act was the employment of a handgun during the shooting event, regardless of the number of firearms used by the various individuals, the number bullets fired by the Defendant, or the number of predicate felonies arising out of that single transaction. Accordingly, the appropriate "unit of prosecution" is a single conviction for the felonious conduct during one transaction—this is true regardless of whether the conviction is garnered under a theory of criminal responsibility or as a principal actor.

As such, Defendant's multiple convictions for employing a firearm during the commission of a dangerous felony violate the principles of double jeopardy. See also State v. Antonio Henderson and Marvin Dickerson, No. W2015-00151-CCA-R3-CD, 2016 WL 3390627 (Tenn. Crim. App. June 10, 2016) (reflecting only one count of employing a firearm during the commission of or attempt to commit a dangerous felony, where defendants were also convicted of one count of especially aggravated robbery, one count of attempted second degree murder, two counts of attempted aggravated robbery, and one count of aggravated assault, in a case that involved three victims); State v. Albert Jackson, No. W2014-00050-CCA-R3-CD, 2014 WL 7432000 (Tenn. Crim. App. Dec. 30, 2014) (illustrating one conviction for employing a firearm during the commission of a felony in a case where defendant was also convicted of attempted voluntary manslaughter, aggravated assault, reckless endangerment with a deadly weapon, and felon in possession of a handgun as a result of his pulling a gun on the driver and front seat passenger of a car in which he was riding); State v. Shawn Thompson, No. M2013-01274-CCA-R3-CD, 2014 WL 2609535 (Tenn. Crim. App. June 11, 2014) (showing that defendant, who fired at a truck occupied by three victims and there were three men playing frisbee golf nearby who were also in the line of fire, was only charged with one count of employing a firearm during the commission of a dangerous felony, where he was ultimately convicted of three counts of attempted voluntary manslaughter and one count of reckless endangerment with a deadly weapon). Additionally, we note that, because we found the proof to be insufficient in count 11 to support the Defendant's conviction for attempted voluntary manslaughter, the proof would likewise not support

---

[16] The defendant was convicted under a prior version of the statute, which read, "A person commits an offense who possesses any deadly weapon with intent to employ it in the commission of or escape from an offense." A similar provision now appears in subsection (d) of the statute.

-41-

the corresponding count of employing a firearm during the commission of that dangerous felony—count 15.

**C. <u>Self-Defense</u>.** The Defendant contends that the "trial court committed legal error when it failed to grant a verdict in his favor" that he "was engaged in the defense of self or others." He states that he

> was in a place where he had a right to be (on a public street); he had no duty to retreat; and he shot with no intent to kill once [co-defendant] Brown shot at him; in this way defending himself and/or defending [L.P.] and [Q.T.] from being further victimized by [co-defendant] Brown.

The State replies that "the evidence is sufficient to support the jury's rejection of self-defense or defense of another."

As to the Defendant's claim that the evidence is insufficient to show that he committed these crimes because he was acting in self-defense, Tennessee Code Annotated section 39-11-611(b) states,

> (1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.
> (2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
> (C) The belief of danger is founded upon reasonable grounds.

Additionally, Tennessee Code Annotated section 39-17-1322, referenced in the self-defense statute, provides as follows:

> A person shall not be charged with or convicted of a violation under this part (which includes employing a firearm during the commission of a dangerous felony) if the person possessed, displayed or employed a

-42-

handgun in justifiable self-defense or in justifiable defense of another during the commission of a crime in which that person or the other person defended was a victim.

(Parenthetical added).

The Defendant also submits that he was acting in defense of L.P. and Q.T. The defense of another is justified under circumstances similar to those justifying self-defense:

A person is justified in threatening or using force against another to protect a third person, if:

(1) Under the circumstances as the person reasonably believes them to be, the person would be justified under § 39-11-611 in threatening or using force to protect against the use or attempted use of unlawful force reasonably believed to be threatening the third person sought to be protected; and

(2) The person reasonably believes that the intervention is immediately necessary to protect the third person.

Tenn. Code Ann. § 39-11-612. The claim of self-defense or defense of another is essentially a fact question for the jury. See State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993).

Viewing the evidence in a light most favorable to the State, the proof shows that the Defendant was driving a Chevy Cobalt, accompanied by co-defendant North, Mr. King, and Mr. Issacs, when they encountered the scene in front of Austin East. All men were armed, and the Defendant testified that he had been previously victimized by co-defendants Campbell and Brown. Several eyewitnesses testified that the first shots came from the Defendant's car. Examination of the Malibu driven by co-defendant Campbell revealed that the car had been "hit at least four times," evidencing that multiple shots were fired. The firearms examiner testified that at least three different weapons were used at the scene. Moreover, the forensic evidence established that L.P. was likely hit by a .45-caliber bullet that came from the Defendant's vehicle. The jury, as was their prerogative, chose not to credit the Defendant's theory of self-defense or defense of others, and we will not second-guess the factual determinations of the jury. Therefore, in this regard, the evidence is sufficient to support the convictions of attempted voluntary manslaughter and the corresponding counts of employing a firearm during the commission of a dangerous felony.

### III. Consecutive Sentencing

As his last issue, the Defendant challenges the trial court's imposition of consecutive sentencing, contending that his forty-year sentence was excessive.[17] According to the Defendant, the trial court ran "every count of conviction consecutive to every other count." The State submits that the Defendant's argument "is based on a flawed premise" and that the total effective sentence imposed was twenty-two years, not forty. The State continues that the trial court properly imposed discretionary consecutive sentencing "by concluding that the [D]efendant was a dangerous offender whose behavior indicate[d] little or no regard for human life and no hesitation about committing a crime in which the risk to human life [was] high."

At the March 14, 2014 sentencing hearing, the trial court sentenced the Defendant to four years on each count of attempted voluntary manslaughter (counts 11-14), all run consecutively to one another. The trial court then imposed six-year sentences on each count of employing a firearm during the commission of a dangerous felony (counts 15-18), which were ordered to be served consecutively to the underlying attempted voluntary manslaughter counts, i.e, count 15 was ordered to run consecutively to count 11, count 16 consecutively to count 12, and so on. According to the trial court's calculations, this resulted in a total effective sentence of twenty-two years.

We agree with the State that the trial court specifically ordered an effective sentence of twenty-two years' incarceration and that the Defendant's sentencing argument is based upon a flawed premise. However, given the anomalies in the sentencing decision, we feel it important to cite to the trial court's ruling:

> In count [number] 11, I sentence you to four years, range I[,] standard offender, to serve in the Tennessee Department of Correction[] for the attempted voluntary manslaughter of [L.P.].

> In count [number] 12, I sentence you to four years to serve consecutive to count [number] 11 for the attempted voluntary manslaughter of [co-defendant Brown].

> In count [number] 13, I sentence you to four years to serve consecutive to count [number] 12, the attempted voluntary manslaughter of [co-defendant Campbell].

---

[17] Again, in the event of further appellate review, we will address all of the Defendant's arguments, so that they not be pretermitted. Ultimately, however, restructuring of the Defendant's effective sentence is plausible for a variety reasons in light of the various holdings in this opinion.

-44-

In count [number] 14, I sentence you to four years to serve consecutive to count [number] 13 for the attempted voluntary manslaughter of [M.W.].

In count [number] 15, I sentence you to six years to serve consecutive to count [number] 11 for the employing a firearm during the attempted voluntary manslaughter of [L.P].

In count [number] 16, I sentence you to six years to run consecutive to count [number] 12 for the employing a firearm during the commission of a dangerous felony, the attempted voluntary manslaughter of [co-defendant Brown].

In count [number] 17, I sentence you to six years to serve consecutive to count [number] 13 for . . . employing a firearm during the commission of a dangerous felony, the attempted voluntary manslaughter of [co-defendant Campbell].

And count [number] 18, I sentence you to six years to run consecutive to count [number] 14 for the employing a firearm during the commission of a dangerous felony; to wit, the attempted voluntary manslaughter of [M.W.], <u>for a total effective sentence of [twenty-two] years to serve as a range I[,] standard offender</u>.

(Emphasis added). Likewise, in our computation of this ruling, the trial court utilized an alignment of concurrent and consecutive sentencing that yields a sentence of twenty-two years.

Tennessee Code Annotated section 40-35-115(b) provides, in pertinent part, that a trial court may order sentences to run consecutively if it finds by a preponderance of the evidence that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high[.]" Tenn. Code Ann. § 40-35-115(b)(4). Moreover, when the imposition of consecutive sentences is based on the trial court's finding the defendant to be a dangerous offender, the court must also find "that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender." <u>State v. Wilkerson</u>, 905 S.W.2d 938, 939 (Tenn. 1995); <u>see also</u> <u>State v. Pollard</u>, 432 S.W.3d 851, 863-64 (Tenn. 2013); <u>State v. Lane</u>, 3 S.W.3d 456, 461 (Tenn. 1999).[18]

---

[18] However, recently in <u>State v. Walter H. Webb</u>, No. M2014-01929-CCA-R3-CD, 2015 WL 8519525

Our supreme court has held that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations" "if [the trial court] has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" Pollard, 432 S.W.3d at 860-61. Thus, the imposition of consecutive sentencing is subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed[.]" Tenn. Code Ann. § 40-35-103(2), (4). Further, "[s]o long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." Pollard, 432 S.W.3d at 862 (citing Tenn. R. Crim. P. 32(c)(1)) ("The order [for consecutive sentences] shall specify the reasons for this decision and is reviewable on appeal."); see also State v. Bise, 380 S.W.3d 682, 705 (Tenn. 2012).

Initially, we note that the Defendant submits that the trial court failed to make the additional findings required by Wilkerson. At the sentencing hearing, the trial court found the dangerous offender criterion to be applicable, reasoning as follows:

> Again, in this case, . . . there's only one potential factor I believe that could allow the [c]ourt to sentence [the Defendant's] counts consecutively, and that is the dangerous offender finding, and the [c]ourt has to not only find that the [D]efendant is a dangerous offender whose behavior indicates little

<hr />

(Tenn. Crim. App. Dec. 11, 2015), perm. app. granted (Tenn. Feb. 10, 2016), our supreme court has granted the defendant's application for permission to appeal and instructed the defendant to brief the following issues:

> Whether this Court's holding in State v. Wilkerson, 905 S.W.2d 933 (Tenn. 1995), that a trial court's "dangerous offender" finding be supported by proof that "the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender," Id. at 938, survives the Court's adoption of the abuse of discretion standard for all trial court sentencing decisions in State v. Bise, 380 S.W.3d 683, 706 (Tenn. 2012), and subsequent cases.

> Whether this Court's original holding in State v. Wilkerson, 905 S.W.2d 933 (Tenn. 1995), that a trial court's "dangerous offender" determination must be supported by specific findings that "the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender," Id. at 938, should be revisited given that no such requirement exists in Tennessee Code Annotated section 40-35-115(a) for making these additional findings on this one factor.

-46-

or no regard for human life and no hesitation about committing a crime in which the risk to human life is high, but also the additional <u>Wilkerson</u> factors where you take into account the overriding purposes and being the punishment should be one justly deserved in relation to the seriousness of the offense, as well as that an extended sentence is necessary to protect society from the [D]efendant's further criminal conduct, and so when we look at this particular case, the [c]ourt does find that, in fact, [the Defendant] is a dangerous offender, and that he is willing to engage in highly risky behavior that presents a crime that is highly risky to the life of others without hesitation.

I don't think these guys even thought or cared when they saw each other that there are all these other kids around, and, you know, to be honest with you, I'm not as concerned if—if they were just shooting up—each other up, but you've got [L.P.], [Q.T.] out there, and you got all these other students, the folks on the bus, the—the mom who was between the bus and [co-defendant Campbell's] car who had picked up her daughter and her friend, all the students and teachers around there, all the folks that are coming for the football game, that is just so overwhelming. I can't stress enough how risky that is that these guys would shoot, and [the Defendant] is the one that started that.

If he was concerned about [co-defendant] Brown confronting these two boys here, you don't just start shooting. You don't just start shooting, and I think you knew that. I think you started shooting because you wanted payback, and I—when I look at that, it just so greatly overwhelms all possible mitigation in this case, despite the fact that I think you're articulate and sincere today, and you've had an history of going through juvenile court, of engaging in—in possession of weapons, and I think it's necessary to protect our community from somebody who would engage in this type of behavior, and so I think consecutive sentencing is justified.

The Defendant admits that the trial court concluded that the terms imposed were necessary in order to protect the public from further criminal acts by him, but he argues that the trial court failed to determine that the terms imposed were reasonably related to the severity of the offenses committed. However, the trial court stated that consecutive sentencing was "justly deserved in relation to the seriousness of the offense" and discussed the circumstances surrounding the Defendant's crimes—that the shoot-out occurred in front of a school where numerous other persons were present and that the Defendant was first to fire his weapon. The record reflects that the trial court adequately considered the <u>Wilkerson</u> factors. Additionally, the record fully supports the trial court's

findings in this regard, and we discern no abuse of discretion by the trial court in imposing partial consecutive sentencing.

We feel constrained to note something not mentioned by either party—consecutive sentencing, as partially imposed, was mandatory in this case. Tennessee Code Annotated section 39-17-1324(e)(1) mandates that a sentence for employing a firearm during the commission of a dangerous felony "be served consecutive to any other sentence the person is serving at the time of the offense or is sentenced to serve for conviction of the underlying dangerous felony." See also Tenn. Code Ann. § 39-17-1324(i)(1)(C), (M) (incorporating attempted voluntary manslaughter as a dangerous felony). Here, given the unique structure of the Defendant's various sentences, each firearm count is aligned consecutive to the corresponding underlying attempted voluntary manslaughter count and then aligned concurrently as much as possible with all the other counts. Although only one firearm conviction remains based upon our analysis above, consecutive sentencing of that count was not discretionary pursuant to section 39-17-1324. The Defendant is not entitled to relief on this issue.

## CONCLUSION

Based on our finding of error in the denial of the Defendant's motion for severance, we reverse the Defendant's convictions and remand the case for a new trial for further proceedings consistent with this opinion. We also note that the Defendant's attempted voluntary manslaughter conviction of L.P. cannot stand and that multiple convictions for employing a firearm during the commission of a dangerous felony in a single transaction violate the Double Jeopardy Clause.

_____
D. KELLY THOMAS, JR., JUDGE

-48-